SAMUEL B. HOBART AND OTHERS, CLAIMANTS OF THE BRIG
HOPE AND CARGO, APPELLANTS v. ANDREW DROGAN AND
OTHERS, LIBELLANTS.

Salvage. The brig Hope, with a valuable cargo, had been conducted, in the evening,
by a pilot inside of Mobile Point, where pilots of the outer harbor usually leave
vessels which they pilot inside of that bar. The pilot was discharged, and the Hope
proceeded up the bay of Mobile. The wind soon after changed, blew a violent gale
from the northwest, both anchors parted, and the Hope was driven on a shoal out-
side of the point, among the east breakers. The gale increased to a hurricane, and
forced the vessel on her beam-ends, and her masts and bowsprit were cut away.
The master and crew deserted her to save their lives. After various fruitless efforts
to save her, the libellants, all pilots of the outer harbor of Mobile, two days after
she was stranded, and while yet in great peril, succeeded; and she was brought up
to the city of Mobile by them, towed by their pilot-boat, assisted by a steamboat
employed by them. On a libel for salvage, the district court of the United States
for the district of Alabama allowed, as salvage, one-third of $15,299 58, the ap-
praised value of the brig and cargo. The owners of the brig and cargo appealed to
this court.

The amount of salvage allowed by the district court is certainly not, under the cir-
cumstances of the case, unreasonable. This court is not in the habit of revising
such decrees as to the amount of salvage, unless upon some clear and palpable mis-
take, or gross over-allowance of the court below. It is equally against sound
policy and public convenience to encourage appeals of this sort in matters of discre-
tion; unless there has been some violation of the just principles which ought to reg-
ulate the subject.

Suits for pilotage on the high seas, and on waters navigable from the sea, as far as
the tide ebbs and flows, are within the admiralty and maritime jurisdiction of the
United States. The service is strictly maritime, and falls within the principles al-
ready established by this court in the case of the Thomas Jefferson, (10 Wheaton's
R. 428,) and Peyroux v. Howard, (6 Peters's R. 682.)

The jurisdiction of the district courts of the United States, in cases of admiralty and
maritime jurisdiction, is not ousted by the adoption of the state laws by the act of
congress. The only effect is to leave the jurisdiction concurrent in the state courts:
and, if the party should sue in the admiralty, to limit his recovery to the same pre-
cise sum, to which he would be entitled under the state laws, adopted by congress,
if he should sue in the state courts.

A pilot, while acting within the strict line of his duty, however he may entitle him-
self to extraordinary pilotage compensation for extraordinary services, as contra-
distinguished from ordinary pilotage for ordinary services, cannot be entitled to
claim salvage. In this respect he is not distinguished from any other officer, public
or private, acting within the appropriate sphere of his duty. But a pilot, as such,
is not disabled, in virtue of his office, from becoming a salvor. On the contrary,
whenever he performs salvage services beyond the line of his appropriate duties, or
under circumstances, to which those duties do not justly attach; he stands in the

same relation to the property as any other salvor: that is, with a title to compensation to the extent of the merit of his services, viewed in the light of a liberal public policy.

Seamen, in the ordinary course of things, in the performance of their duties, are not allowed to become salvors, whatever may have been the perils, or hardships, or gallantry of their services in saving the ship and cargo. Extraordinary events may occur, in which their connexion with the ship may be dissolved de facto, or by operation of law; or they may exceed their proper duty, in which cases they may be permitted to claim as salvors.

It is not within the scope of the positive duties of a pilot to go to the rescue of a wrecked vessel, and employ himself in saving her or her cargo, when she was wholly unnavigable. That is a duty entirely distinct in its nature, and no more belonging to a pilot, than it would be to supply such a vessel with masts or sails, or to employ lighters to discharge her cargo, in order to float her. It is properly a salvage service, involving duties and responsibilities, for which his employment may peculiarly fit him; but yet in no sense included in the duty of navigating the ship.

This was a case where the libellants acted as salvors, and not as pilots. They had, at the time, no particular relation to the distressed ship. They proffered useful services as volunteers, without any pre-existing covenant, that connected them with the duty of employing themselves for her preservation. The duties they undertook were far beyond any belonging to pilots, and precisely those belonging to salvors.

ON appeal from the district court of the United States for the southern district of Alabama.

The ship Hope was bound to Mobile from Havana, in January, 1832, with a cargo of fruit, sugar, coffee, segars, and tobacco. She arrived off the port of Mobile on the 24th January, 1832, took a pilot, and was carried safely within Mobile Point, to a place at which the pilots are usually discharged; the pilot then left her, and she proceeded some distance up the bay, and came to anchor about six miles within Mobile Point.

In the night, the wind rose to a powerful gale; in the course of which the brig parted her cables, and was driven by the force of the winds and waves below Mobile Point, where she grounded. The master and crew, in order to save their lives, took to the boat, and left the brig and cargo.

The vessel remained grounded for some time in great peril, having bilged, and having four feet water in her hold. The libellants, who were pilots of the outer harbor of Mobile, after having, without success, made previous efforts to board her, at length succeeded; and less than half an hour afterwards, the wind having changed, the vessel and cargo floated off; and the libellants took her in charge. Had not the libellants been on board

[Hobart et al. v. Drogan et al.]

the Hope at the time the wind changed, she would have been driven on the opposite shore, and would, with her cargo, in the opinion of the witnesses examined in the district court, have been totally lost. She was towed by the boats of the libellants into the port of Mobile.

The libellants proceeded for salvage against the Hope and cargo, and the district court awarded to them, as salvage, one-third of the value of the ship and cargo. The total value of the property saved was $15,299 58.

The owners appealed to this Court.

The case was argued by Mr. Ogden, for the appellants, and by Mr. Southard, for the appellees.

The facts of the case are stated more at large in the opinion of the court.

Mr. Ogden contended, that as the libellants were pilots of the outer bay of Mobile, they could not be considered as salvors; and could not claim salvage for such services as those which had been rendered to the Hope. The proceedings in the district court were for salvage, as appears by the bill; and the decree of that court, made on the 18th January, 1833, is for one-third of the amount of the appraised value of the property saved, " as salvage."

Having claimed as salvors, and the law not authorizing such a claim, they cannot now, by an amendment of the libel, state such a claim as this court will ratify. The amendment would alter the whole nature of the case; and although amendments are, in many cases, allowed in an appellate court, this is not such a case. Cited 9 Cranch, 244, 284. The Edward 1 Wheat. 261 ; 7 Cranch, 570 ; Divina Pastora, 4 Wheat. 52.

The following points were presented for the consideration of the court:

1. That it was the duty of the libellants, as pilots, to give any assistance in their power, to vessels in distress, within the limits of their pilot ground ; and this being a service rendered in discharge of their duty, forms no case for a claim of salvage.

2. That the act of congress leaves the regulations of pilots

[Hobart et al. v. Drogan et al.]

to the state laws; and by the law of Alabama, any extra allowance claimed by pilots, must be fixed by the wardens of the port.

3. That the district court of Alabama had no jurisdiction in this case.

By the libel it appears that the libellants were pilots of the port of Mobile, in Alabama; and the first question for the consideration of the court is, whether pilots can claim salvage under the circumstance of this case.

The principles of law which regulate such claims, claims for compensation and reward for services which are performed in the ordinary course of the duties of the sitation of the person who performs them, virtute officii, are reported in the case of Le Tigre, 3 Wash. C. C. R. 570, 71. A pilot is not entitled to salvage unless he goes beyond his ordinary duties. A person who is bound to render assistance in saving a ship, cannot be considered a salvor. The Neptune, 1 Hog. Ad. Rep. 266; The Joseph, 1 Rob. Ad. Rep. 257. A pilot is not to claim as a salvor. Bees. Ad. Rep. 212. A case has been decided by Mr. Justice Thompson, in the circuit court of the southern district of New York, in which pilots who had rescued the ship from great danger, were not admitted to be salvors. The case of the Wave, Mss. Rep. The danger in which the vessel may be, does not lessen the duty of a pilot to rescue and save her. When a vessel is in distress, and is found in that situation by pilots on their cruising ground, it is their duty as pilots to bring her into port. If the services have been great, they are entitled to extra pilotage, to be decided according to the laws of the state of which the port out of which the pilots cruise is a part. The regulations of pilots of the port of Mobile, make provision for extra compensation in such cases; and in conformity with these regulations, and under them, the libellants were bound to present their claims.

It was contended that the case of the Wave was in all important particulars the same as the case before the court. The Wave was outside of the port of New York, was in great peril, and was boarded off Sandy Hook by the pilots. The court would allow no salvage.

On the second point, it was argued that if the libellants cannot

[Hobart et al. v. Drogan et al.]

claim as salvors, they cannot claim extra compensation by proceeding in the district court by a libel. The compensation or extra allowance must be fixed, according to the laws of Alabama, by the wardens of the port of Mobile.

It is admitted that claims for services rendered by pilots which may entitle them to extra allowances, may be entertained in the admiralty; but the admiralty jurisdiction of the courts of the United States in such cases is concurrent with that of the courts of the States—It is not exclusive. In the same manner, actions for seamen's wages may be maintained in the courts of common law, although they are more properly of admiralty proceedings. It is for convenience, as all the seamen of a ship may be joined in a libel for wages, that such claims are generally presented in the admiralty; and not because the admiralty has exclusive cognizance of them. The jurisdiction of the courts of common law and of courts of admiralty being concurrent, the recovery in both courts should be the same, and should be regulated and limited by the provisions of a law applicable to the case. To suppose that proceedings in one court would produce a different result, a higher or a lower rate of compensation, would not be proper. The principles of the law in both courts should be alike, as would be the evidence; and the application of these principles should be the same.

If then a compensation is fixed by law for the services of a pilot, he cannot, by coming into the admiralty, ask a greater compensation than is allowed him by a law applicable to the case. If, by the provisions of a law, extra compensation is to be given, and the manner in which the amount of such compensation is to be determined is fixed; no recovery can be had in the admiralty until after a proceeding under the provisions of the law shall have determined the amount of the allowances; and that alone can be recovered in the admiralty. Has the law fixed any compensation for the services of pilots who perform ordinary or extraordinary duties?

The constitution of the United States gives to congress the power to regulate commerce. Under this power it may be that congress might regulate the pilots in all the ports of the United States; but it is not admitted that they could do this to the full

extent : they could not regulate the compensation to pilots, for, if they could, they might regulate the wharves and fix the rate of wharfage in all the seaports. The duties of pilots, their regulation, their compensation, are properly left to the legislatures of the states of the Union. Congress, whatever may be their powers, have, by an act passed on the 7th of August, 1794, (2 Laws U. S. chap. 9, sec. 4,) declared that pilots in the ports of the United States shall be regulated by state laws. By this provision, the laws of the states are to govern in all the claims made by pilots, until congress shall interfere.

Alabama has passed laws for the government and regulation of pilots and pilotage ; the fare for the ordinary services of pilots is fixed, and provision is made for determining the compensation for extraordinary services. This is to be determined by the wardens of the port. Their law is in all respects the same as the law relative to pilots in New York.

It has been decided by Mr. Justice Thompson, in the case of the Wave; that congress has, by their act of 1794, adopted all the laws of the states in relation to pilots. If so, then the libellants could not proceed in the district court of Alabama, as that court had no jurisdiction of the case.

Mr. Southard, for the appellees.

The libellants are pilots of the outer harbor of Mobile ; and their duty is to conduct vessels from the gulf of Mexico into the bay of Mobile. They performed services by which the brig Hope and cargo were saved from a total loss and entire destruction ; and by the district court of the United States for the district of Alabama, they have been allowed one-third of the value of the property saved, as salvage. They presented themselves before that court as salvors, and their claim here is purely a question of salvage. This claim is distinctly made in the libel as a claim for salvage ; and it will be treated as such in the argument now addressed to the court.

It is not denied that the services of the libellants were meritorious. They boarded the vessel when she was in extreme peril, while she was yet aground, before she floated off by the change of wind ; she was saved from being driven to the opposite shoal,

where she would have been totally wrecked. All the duty required from pilots had been done when the Hope had been conducted up to the inner harbor of Mobile. For twenty-seven hours the pilot who had navigated her up to Mobile had been on board of the Hope, and he was properly discharged: all that could be required of a pilot of the outer harbor had been done, and his connexion with the vessel was at an end. If, after a vessel arrives in the inner bay, a pilot is wanted, a pilot of that bay is called upon. Thus one of the libellants who had piloted the vessel up the bay, had ceased to have any connexion with her; and the other libellants never had any thing to do with her, until they went on board of her after the disasters had occurred which had driven her on shore. For two hours after the pilot had left her she had remained at anchor. If, within that time, her situation had become such as to require a pilot, if she had become dismasted, cast away, sunk, no duties could have been called for from the pilot of the outer harbor. Pilots are not general conservators of shipping. They are not to be called upon more than any other persons to save vessels.

The Hope had been driven out to sea; she was on shore half a mile out of Mobile Point; she was in no "port," no "harbor," no "bay," which are the places mentioned in the act of congress of 1794. The place where she lay was on "the high seas," beyond the local jurisdiction of the state of Alabama, or of any state; in no county. All the authorities make the place the "high seas." It was where "the winds and waves prevail without check or control:" beyond the fauces terræ. She was a wreck on the ocean.

Other facts are proper to be considered. The ship and cargo were in a situation of imminent peril; her masts and spars were cut away. She had no cable, no anchor; all were lost. She was striking on the ground, amidst the breakers; had sprung aleak, and had two feet of water in her hold before she struck on the bank, and upwards of three feet when she floated, with the libellants on board; her pumps were choked; she had a signal of distress at the stump of the mast; the captain and crew had deserted her to save their lives, and there was no living man on board.

The Hope was not in a situation to require a pilot. No pilot-age services would have been useful to her: and the evidence shows that such was the opinion of the master, for he did not call on the libellants, as pilots, to go to the rescue of the vessel.

While she was in this situation, some persons, other than the libellants, went on board of her and saved some articles. They could not remain with her, and she was again abandoned and deserted. Twenty-four hours afterwards the libellants took charge of her. The articles saved from the vessel, before the libellants boarded her, were the subject of salvage. These circumstances, and others of equal importance, of the same character, exhibit a case of property actually rescued by the libellants from entire loss, at great hazard to them, and with great labor and difficulty. If they are considered as salvors by this court, the allowance of the district court must be ratified. Salvage is the reward for efficient services; and it is a premium which is given to induce like efforts, when, by the casualties of the ocean, they are re-quired. The proposition of the counsel for the appellants is, that the libellants were pilots, and not salvors. If this is the case pilots can never be salvors. To show that this is not the law, the following cases were cited: The Helen, 3 Rob. Rep. 183; the Apollo, 3 Rob. 249; the Two Catharines, 2 Mason's Rep. 335, 338; 2 Cranch, 268.

To carry the principle contended for by the counsel of the appellants into effect, would produce the highest injustice. An officer performing acts within the sphere of his duty, is not to ask for more than his regular compensation; but beyond it, and out of the line of his duty, there is no reason why services so extensive, if meritorious, shall not be rewarded. 3 Kent's Commentaries, 197, 198. To say that pilots shall not have salvage, in any case, is a dangerous position; dangerous to humanity, dangerous to commercial property, and ought not to be admitted.

As to the appellant's second point, it is submitted that to main-tain it, counsel must show that, by law and regulation, it was the duty of the pilots to save the Hope in the situation in which she was.

As she was not in any of the places mentioned in the act of congress of 1794; in no "port," no "harbor," no "bay," no

[Hobart et al. v. Drogan et al.]

" haven," the act does not apply: the law, on a doubtful point, should not receive a severe construction.

But the constitutionality of that law, if correctly construed by the counsel for the appellants, may be doubted. If there can be power in the states to regulate pilots in the bays, harbors, and havens of the United States; if congress can give such powers; the whole jurisdiction of the admiralty may be surrendered and no longer exist in the courts of the United States. If congress can authorize the regulation of pilots in harbors, by the states, no power exists in congress to give to the states the regulation of pilots on the high seas.

It may be doubted if congress can say to a party who has a case of admiralty and maritime jurisdiction, your case shall be decided by the wardens of a port in one of the states. The act of 1794 was but temporary, as it provides for the regulation of pilots in the states until otherwise regulated. Pilotage is a subject, from its very nature, of admiralty jurisdiction; and it is also of common law jurisdiction. But it is denied that congress can prevent its being cognizable in courts of admiralty, encumbered by state laws; although it shall be allowed to be within the concurrent jurisdiction of the courts of common law.

The argument that pilotage cannot be the subject of jurisdiction in two courts is not sound. Such concurrent jurisdiction frequently exists. Cases are sustained in courts of common law, which are also cognizable in courts of chancery. A larger relief is often sought and obtained in chancery, than is afforded at common law.

If the case of the Wave shall be considered as influencing the claim of the libellants, it is submitted that, as the pilot laws of New York were passed before the act of congress of 1794, that act might be considered as having adopted those laws: but Alabama was not a state in 1794; and it will not be claimed that by prospective legislation congress could adopt state laws to be enacted at a future period.

The case of the Wave was, in all its material features, different from that of the Hope. The Wave was within the fauces terræ; within the pilot ground; within a bay, a haven, and subject to the laws regulating pilots: and, in that case, it was said by

[Hobart et al. v. Drogan et al.]

the judge that pilotage is of admiralty jurisdiction; and he also says that there may be cases in which pilots may be salvors. This is stated after a full examination of all the decided cases.

Mr. Ogden, in reply, argued that in the situation the Hope was when boarded by the libellants, nearly afloat, she should have been brought by the libellants into Mobile, in their capacity of pilots. Had she been found at sea, and in a state of wreck, deserted, the pilots, as pilots, should have taken charge of her.

Until congress shall pass laws regulating pilots they are necessarily of State regulation. They reside in the particular states, and their transactions are essentially connected with the safety and welfare of the citizens, and with the business of the states where they reside. Unless prohibited by congress, the establishment of a system for their government seems of essential importance and necessity.

When congress declared that pilots should be regulated by state laws, they did not take away the admiralty jurisdiction. They oblige the pilot to submit to the regulations of the states as to the amount of pilotage; but this ascertained, he may enforce its payment in an admiralty proceeding

Mr. Justice STORY delivered the opinion of the Court.

This is an appeal from a decree of the district court for the southern district of Alabama, in the case of a libel for salvage, instituted in the court below by the appellees. That decree awarded to the appellees one-third of the appraised value of the brig and cargo as salvage : the appraised value being $15,299 58.

The material facts of the case are as follows. The brig Hope, belonging to Charlestown, near Boston, being on a voyage from the Havana to the port of Mobile, on the 24th of January 1832, took a pilot (who was one of the libellants) about ten miles W. S. W. from Mobile point, by whom she was conducted inside of Mobile point, to the place, where the pilots at the outward bar of that point usually leave vessels which they pilot inside of that bar, about half past seven o'clock of the evening of the next day ; and he was then discharged by the master of the brig. The brig then proceeded on her course up the bay of Mobile, and came-to

[Hobart et al. v. Drogan et al.]

anchor about nine o'clock the same evening. About this time the wind changed to the northwest, and in the course of the night it blew a violent gale ; the brig parted both her anchors, and was driven outside of Mobile point about two miles, and then brought up among the east breakers. At this time the gale had increased to a hurricane, the sea broke over the brig in every direction, and forced her on her beam-ends. At five o'clock in the morning the masts and the bowsprit were cut away to relieve and right her, for the safety of the vessel, cargo, and crew, and a signal of distress was hoisted. At noon, the flood tide making, the breakers increasing, and the gale continuing, there being two feet of water in the hold, and the pumps being choked with coffee, the master and crew, to save their lives and the ship's papers, left the brig in the long-boat and made for the shore, and were taken up by the custom-house boat. On the evening of the next day the master of the brig made arrangements with the libellants, who are all pilots of the port of Mobile, with their boats and the crew of the brig, to make efforts to extricate the brig and cargo from their perilous condition. Accordingly, the next morning an attempt was made by the libellants and the master (the mate and the crew of the brig declining to assist) to get on board of the brig ; but it still blew so fresh, that it became impossible to board her. The master of the brig then went on shore from the pilot boat, which anchored at Mobile point. About one o'clock of the same day the brig shifted her position, and the libellants discovered her to be nearly afloat. The pilot boats were then got under weigh, and in about three-quarters of an hour afterwards the libellants, being then on board, and no other persons, the brig floated. At this time the wind was blowing fresh from E. S. E. ; and if the brig had not been taken possession of by the libellants she would have been drifted on the west bank, and have become a complete wreck. The brig was then towed by the pilot boats and a steamboat, procured by the libellants, to the port of Mobile, in the course of the two succeeding days. Such are the material facts.

In the course of the proceedings in the court below, an agreement was asserted to have been made between the parties, that, in case the vessel and cargo should be saved, the compensation

[Hobart et al. v. Drogan et al.]

should be fixed by the chamber of commerce of Mobile. That agreement, however, is denied, by the libellants, to have been applicable to the actual circumstances of the case; and no compensation was, in fact, awarded by the chamber of commerce. That agreement has not been insisted on here in the argument on either side; and, indeed, being to a mere amicable tribunal, as arbitrators, could not, in a case of this sort, be now insisted upon to bar the jurisdiction of the court. It is wholly unlike the case, where a positive law has fixed the mode of ascertaining the compensation.

No objection has been made to the amount of salvage decreed by the court below, if the libellants are entitled to any. And the objection has been properly abandoned; for the amount under the circumstances is certainly not unreasonable. Besides, this court is not in the habit of revising such decrees as to the amount of salvage, unless upon some clear and palpable mistake or gross over-allowance of the court below. It is equally against sound policy and public convenience to encourage appeals of this sort in matters of discretion; unless there has been some violation of the just principles which ought to regulate the subject.

Three objections have been made to the decree: First, that it was the duty of the libellants, as pilots, to give every assistance in their power to a vessel in distress within the limits of their pilot gound; and that this, being a service rendered in the discharge of their duty, forms no case for a claim of salvage. Secondly, that the act of congress on this subject, (act of 7th of of August, 1789, ch. 9.    ) leaves the regulation of pilots to the state laws; and that by the laws of Alabama any extra allowance claimed by these pilots must be fixed by the wardens of the port. Thirdly, that the district court had no jurisdiction of the case.

In respect to the last objection, it has been urged in a very limited form, not as an objection to the jurisdiction of the courts of admiralty to entertain suits for pilotage generally; but only for pilotage under circumstances like the present, where a fixed compensation is established, under the authority of congress, by the state laws. We are of opinion that suits for pilotage on the high seas, and on waters navigable from the sea, as far as the

tide ebbs and flows, are within the admiralty and maritime jurisdiction of the United States. The service is strictly maritime, and falls within the principles already established by this court in the case of the Thomas Jefferson, (10 Wheaton R. 428,) and Peyroux v. Howard,-(6 Peters R. 682.)

The other part of the objection is not, in our opinion, maintainable. The jurisdiction of the district courts of the United States, in cases of admiralty and maritime jurisdiction, is not ousted by the adoption of the state laws by the act of congress. The only effect is to leave the jurisdiction concurrent in the state courts; and, if the party should sue in the admiralty, to limit his recovery to the same precise sum, to which he would be entitled under the state laws, adopted by congress, if he should sue in the state courts.

The second objection has been met at the bar by an argument of a grave cast, viz. that the act of congress, so far as it adopts the future laws to be passed by the states on the subject of pilotage, is unconstitutional and void; for congress cannot delegate their powers of legislation to the states; and that as Alabama was not admitted into the union as a state until the year 1819, and its laws on this subject have been long since passed, (in 1822) these laws are, ipso facto, nullities. This question was much discussed in the case of Gibbons v. Ogden, (9 Wheaton, R. 207, 208,) and may not be without difficulties. But we are spared from any discussion of it on the present occasion, because we are of opinion, that the present is not a case of pilotage, but of salvage; and congress have never confided to the states any power to regulate salvage on the sea, or on tide waters; but the same belongs to the district courts, in virtue of the delegation to them of admiralty and maritime jurisdiction.

Whether, indeed, this be a case of salvage or not, is the point involved in the first objection; and we shall now proceed to state the reasons why we are of opinion, that it is.

We agree to the doctrine stated in the cases cited at the bar, that a pilot, while acting in it in the strict line of his duty, however he may entitle himself to extraordinary pilotage compensation for extraordinary services, as contradistinguished from ordinary pilotage for ordinary services, cannot be entitled to claim sal-

[Hobart et al. v. Drogan et al.]

vage. In this respect he is not distinguished from any other officer, public or private, acting within the appropriate sphere of his duty. But a pilot, as such, is not disabled, in virtue of his office, from becoming a salvor. On the contrary, whenever he performs salvage services beyond the line of his appropiate duties, or under circumstances, to which those duties do not justly attach; he stands in the same relation to the property as any other salvor; that is, with a title to compensation to the extent of the merit of his services, viewed in the light of a liberal public policy. Sir William Scott, in the case of the Joseph Harvey, (1 Rob. 306,) speaking upon this subject, where pilots were claiming as salvors, said, "This is a petition praying salvage; and it is said by his majesty's advocate, that it is impossible for these persons to claim salvage, as there is little more than pilotage due; although it is allowed that the court may, in cases of pilotage, as well as of salvage, direct a proper remuneration to be made. It may be in an extraordinary case difficult to distinguish a case of pilotage from a case of salvage properly so called; for it is possible, that the safe conduct of a ship, under circumstances of extreme personal danger and personal exertion, may exalt a pilotage service into something of a salvage service. But, in general, they are distinguishable enough; and the pilot, though he contributes to the safety of a ship, is not to claim as a legal salvor." From this language it is obvious, that the learned judge had in his mind the distinction between extraordinary pilotage services, and salvage services properly so called; the one clearly going beyond the mere line of duty, and the other going merely to the extreme line of duty. In the case of the Aquilla, (1 Rob. 37,) where a magistrate, acting in discharge of his public duty, demanded to be considered as a salvor, the same learned judge said: "This, however, is certain, that if a magistrate, acting in his public duty, on such an occasion, should go beyond the limits of his official duty in giving extraordinary assistance, he would have an undeniable right to be considered as a salvor." The same principle was fully recognised by Mr Justice Washington, in the case of Le Tigre, (3 Wash. Cir. R. 169, 170, 171,) in which, after stating that ordinary official duties were not to be compensated by salvage, he added: "Of this class of cases is that of a pilot,

SUPREME COURT.

who safely conducts into port a vessel in distress at sea. He acts in the performance of his ordinary duty, imposed upon him by the law and nature of his employment; and he is, therefore, not entitled to salvage, unless in a case where he goes beyond the ordinary duties attached to his employment." Mr. Justice Thompson in the MS. case of The Wave, cited at the bar, maintained the same doctrine, upon an elaborate review of all the cases. It has been also applied to another very meritorious class of cases, we mean that of seamen, who in the ordinary course of things, in the performance of their duties, are not allowed to become salvors, whatever may have been the perils or hardships or gallantry of their services in saving the ship and cargo. We say in the ordinary course of things; for extraordinary events may occur, in which their connexion with the ship may be dissolved de facto, or by operation of law, or they may exceed their proper duty, in which cases they may be permitted to claim as salvors. Such was the case of the seaman left on board in the case of the Blaireau (2 Cranch, R. 268,); and such was the exception alluded to in the case of the Neptune (1 Hagg. Adm. R. 236, 237.(a). In this last case, Lord Stowell, after saying that the crew of a ship cannot be considered as salvors, gave what he deemed the definition of a salvor: "What (said he) is a salvor? A person, who, without any particular relation to a ship in distress, proffers useful services, and gives it as a volunteer adventurer without any pre-existing covenant, that connected him with the duty of employing himself for the preservation of that ship." And it must be admitted, that, however harsh the rule may seem to be in its actual application to particular cases, it is well founded in publicpolicy, and strikes at the root of those temptations, which might otherwise exist to an alarming extent, to seduce pilots and others to abandon their proper duty, that they might profit by the distresses of the ship, which they are bound to navigate.

Such, then, being the rule, let us see, whether it has any application to the actual circumstances of the present case. In the first place, none of the libellants were, at the time of the service

(a) See 3 Kent, Comm. Lect. 47, p. 199, (1st edition.) The Two Catherines, 2 Mason, 319. Newman v. Walters, 3 Bos. and Pull. 612.

performed, at all connected with the Hope in the character of pilots. The pilot had been regularly discharged at the usual place, after arriving at Mobile point; and he became, therefore, as to her, *functus officio*, until there was some new call for pilot duty. Now, the subsequent services, asked by the master and proffered by the libellants, as the very agreement suggested in the proceedings abundantly shows, was not understood by either of the parties to be for mere pilot services, but for services of a far different and more extensive nature and character than belong to such an employment.

Indeed, in no just sense can the services of these libellants be deemed to fall within the scope of the duties of pilots. Lord Tenterden, in his excellent Treatise on Shipping (part 2, ch. 5, s. 1, p. 148,) has defined a pilot to be " a person, taken on board at a particular place, for the purpose of conducting a ship through a river, road, or channel, or from or into a port." His duty, therefore, is properly the duty to navigate the ship over and through his pilotage limits, or, as it is commonly called, his pilotage ground. The case, therefore, necessarily presupposes, that the ship is in a condition capable of being navigated; distressed, if you please, and laboring under difficulties, but still capable, in point of crew, equipments, and situation, of being navigated. No one ever heard of its being within the scope of the positive duties of a pilot to go to the rescue of a wrecked vessel, and employ himself in saving her or her cargo, when she was wholly unnavigable. That is a duty entirely distinct in its nature, and no more belonging to a pilot, than it would be to supply such a vessel with masts or sails, or to employ lighters to discharge her cargo, in order to float her. It is properly a salvage service, involving duties and responsibilities, for which his employment may peculiarly fit him; but yet in no sense included in the duty of navigating the ship. Lord Alvanley, in Newman v. Walters, (3 Bos. and Pull. 616,) puts a case far short of that, which is here presented, as a clear case of salvage. " Suppose (said he) a tempest should arise, while the pilot is on board, and he should go off in a boat to the shore to fetch hands, and should risk his life for the safety of the ship in a manner different from that, which his duty required; in such a case it seems to me, that he would be entitled to a compensation in the nature of sal-

[Hobart et al. v. Drogan et al.]

vage; and I am glad that Sir William Scott appears to entertain the same opinion." Now, in the case here supposed, the pilot had already acquired a relation to the ship by having actually entered upon the service as such; and yet the learned judge holds it upon principle, a clear case of salvage.

What were the circumstances under which the present service, was performed? The brig was stranded upon a bank, with the sea rolling over her; her masts, and bowsprit were cut away; her pumps were choked; two feet of water were in her hold; she was deserted by her master and crew, and incapable of navigation by herself; and even when gotten off, she was navigated only by being towed by two pilot boats and a steamboat into port. At this time the libellants had no official connexion whatsoever with her as pilots. Where then was the obligation on them to go on board, and take charge of a wreck, and to hazard their lives and property, and to apply their labor to deliver the brig and cargo from their present imminent perils, any more than on any other persons? We know of none. We think the whole enterprise was an enterprise of salvage, and not of pilotage. It was a case, where they acted as salvors strictly according to the definition of Sir William Scott. They had at the time no particular relation to the distressed ship; they proffered useful services as volunteers, without any pre-existing covenant, that connected them with the duty of employing themselves for her preservation. The duties they undertook were far beyond any belonging to pilots, and precisely those belonging to salvors.

For these reasons, therefore, we are of opinion, that the decree of the district court of Alabama ought to be affirmed with costs.

This cause came on to be heard on the transcript of the record from the district court of the United States for the southern district of Alabama, and was argued by counsel; on consideration whereof, it is adjudged and decreed by this Court, that the decree of the said district court in this cause be, and the same is hereby affirmed, with costs and damages at the rate of six per centum per annum, on the amount decreed by the said district court as salvage.