Pierrepont, J.
Since April 4th, 1857, the following provisions of the Pilot laws of this State have been in force (Laws of 1853, p. 921; Amendatory Act, April 11, 1854, Laws of 1854, p. 459; Amendatory Act, April 4, 1857; Laws of 1857, p. 500):
Sections 1-8: Create the Board of Commissioners of Pilots, consisting of five persons, three to be elected by the Chamber of Commerce, and two by the Board of Marine Underwriters, and provide for their term and tenure of office, &c.
Sections 9, 10: The Commissioners have power to license as many Pilots as they think necessary for the port of New York, to pilot vessels by the way of Sandy Hook. Provisions as to examination of applicants, in respect to character, capacity, &c., and bonds to be given by Pilots. • •
*504 Section 12: The - Commissioners have power to make, promulgate, and enforce new rules or regulations, not inconsistent with the laws of this State or of the United States; to be binding upon all Pilots licensed by them, and upon all persons employing such Pilots.
Section 13: Establishes the rates of Pilotage, and provides as follows:
“When any ship or vessel, bound to the port of Hew York, and boarded by any Pilot licensed by this Board, at such distance to the southward or eastward of Sandy Hook lighthouse as that said lighthouse cannot be seen from the deck of such ship or vessel in the daytime and in fair weather, the addition of one-fourth to the rates of pilotage hereinbefore mentioned shall be allowed to such Pilot.”
Section 14: Prescribes the rates of pilotage.
Section 15: Provides that the rates of pilotage for any intermediate distance shall be determined by the Board of Commissioners, and promulgated in their rules and regulations for the government of Pilots.
Section 16: Relates to rates of pilotage in winter.
Section 17: The pilotage shall be payable by master, owner, consignees or agent entering or claiming the vessel.
Section 29: Provides that “ all vessels sailing under register, bound to or from the port of New York, by the way of Sandy Hook, shall take a licensed Pilot; or, in case of refusal to take such Pilot, the master shall himself, or the owners or consignees, shall pay the said pilotage, as if one had been employed; and such pilotage shall be paid to the Pilot first speaking or offering his services as Pilot to such vessel.”
Under these laws a Board of Pilot Commissioners was created, and article 19 of their by-laws declares that “ the pilotage-ground of the port of Hew York shall be deemed to be west of a line drawn in the shortest direction from Eire Island Light to that of Barnegat Light.” If these laws and by-laws are valid and binding upon the defendant, then the plaintiff is entitled to recover, since it is conceded that the plaintiff was a licensed Pilot under these laws, and that he was the first to offer his services after the defendant’s vessel reached the pilot-ground as defined by the Commissioners.
*505 By the Constitution of the United States, (art. 1, § 8,) the power to regulate commerce is vested in Congress. The power to regulate commerce includes the power to regulate navigation, and pilot laws are regulations of navigation. This is settled law. (Gibbons v. Ogden, 9 Wheat., 1; Hobart v. Drogan, 10 Pet., 108; Cooley v. Port Wardens of Philadelphia, 12 How. U. S. R., 317; 11 Pet., 152; Norris v. City of Boston, 7 How. U. S. R., 283.)
The act of Congress of March 2, 1837, authorizes the master of any vessel, coming into any port situate upon waters which are the boundaries of two States, to employ any Pilot duly licensed or authorized by the laws of either of the States bounded on the said waters, to pilot the vessel to or from said port, any law, usage or custom to the contrary notwithstanding. (Statutes at Large, vol. 5, pp. 153, 154.)
On the 30th day of August, 1852, the Congress of the United States passed an act, entitled “ An act to amend an act entitled ‘ an act to provide for the better security of the lives of passengers on board of vessels propelled in whole or in part by steam, and for other purposes.’ ” (Statutes at Large, vol. 10, p. 61.)
By section 9 of that act it is provided that, “instead of the existing provisions of law for inspection and equipment of steamers, and the present system of pilotage of such vessels,” a Board of Inspectors shall be appointed, who alone can license engineers and pilots for such steamers.
Subdivision 7: The Inspectors shall “ license and classify all engineers and pilots of steamers carrying passengers.”
Subdivision 8: Whenever any person, claiming “to be qualified to perform the duties of engineer upon steamers carrying passengers, shall apply for a certificate, the Board of Inspectors shall examine the applicant,” &c.
Subdivision 9: Whenever any person, “ claiming to be a skillful pilot for any such vessel shall offer himself for a license, the said Board shall make diligent inquiry,” &c.
Subdivision 10: It shall be unlawful “for any person to employ, or any person to serve, as engineer or pilot on any such vessel, who is not licensed by the Inspectors,” &c.
The plaintiff was not a pilot licensed under this act, and the steamer was on the high seas, beyond the jurisdiction of New *506 York, when, his services were tendered. The vessel afterwards took a pilot, (duly licensed under this law of Congress, and also licensed by the New York Board of Pilot Commissioners,) who conducted her into port.
Barnegat is not under the jurisdiction of the State of New York, and a line from Eire Island light to Barnegat is over the high seas, where New York has no authority.
Congress has the exclusive jurisdiction of this subject of navigation, including pilotage, and Congress had legislated upon the matter, and had declared what kind of pilot such vessel should take, and had made it unlawful to take any other.
The Act of Congress of August the 7th, 1789, (§ 4,) gives authority to the States to regulate pilotage only within the bays, inlets, rivers, harbors, and ports of the United States, but does not extend their jurisdiction over the high seas.
The Act of Congress, passed March the 2d, 1837, (Statutes at Large, vol. 5, p. 153,) authorizes the master of any vessel coming into any port situate upon waters which are the boundaries of two States, to employ any pilot duly licensed by the laws of either of the States bounded on the said waters. Hence, it follows, that if this steamer (under the Act of 1837) had taken a New Jersey pilot, and under the Act of 1852, had taken a United States pilot, she might still have been compelled to take a New York pilot, if he first spoke the vessel anywhere in the Atlantic Ocean before she could get into port, (if the plaintiff’s view of the law is correct.)
I think the by-laws of the Pilot Commissioners, under the laws of the State of New York, are in conflict with the act of Congress, and that the former must yield, and that the plaintiff cannot recover in this action.
The decision, in the case of Cooley v. The Port Wardens of Philadelphia, (12 How. U. S. R., 320,) will be found upon examination to sustain, and not to conflict with these views.
For these reasons, I think judgment should be entered for the defendant, with costs.
Robertson, J.
The right to recover a sum of money equal to what would have been the pilotage of the defendant’s steamship, the Empire City, must turn upon the question of the interference *507 of the Act of Congress of 1852, (X., Stat. at Large, pp. 60-67,) .with the State Laws of New York, (Session Laws of 1853, p. 921; id., 1854, p. 459; id., 1857, p. 500.) In case of actual conflict, of course the former must control; if both cannot be carried out, the latter must give way.
It may be true that the residence of the power in Congress unexercised, will not deprive the States of concurrent power to make pilot laws; or that, if the permission of the former be necessary to enable the latter to exercise such power, the act of Congress of August, 1789, (I. Statutes at Large, 54,) gives it, (Cooley v. The Port Wardens of Philadelphia, 12 How. U. S. R., 299,) yet the moment the Federal power is put in motion, it overrides the State authority. (New York v. Milne, 11 Peter’s R., 158.)
Two separate evils appear to have been provided against by the State Laws, and the Act of Congress in question: the former were designed to create and nurse a class of hardy, adventurous seamen, well acquainted with the reefs, shoals, rocks and intricacies of harbor navigation and the tides, and winds, of the waters of the harbor in which they are to ply their trade; the latter to prevent the accidents arising from imperfect construction, management and control of the class of vessels propelled by steam, as well as the engines and apparatus belonging to them, and it is exclusively devoted to such class.
It is true, that the former may have had in view the encouragement of enterprise in venturing far out to sea, to hail vessels, and offer service, by giving the pilotage to the first pilot who should so offer his service, and also adding to it off-shore pilotage for open sea-service, and it may be legitimately within the power of the State to carry out its system by inflicting the payment of double pilotage upon vessels who attempt to interfere with its policy; but this will not be enough to warrant the defendant in incurring the penalty of violating United States laws in order to obey those of the State. If Congress has excluded all persons except those licensed under the Act of 1852, from directing the management of steamships, the State laws cannot inflict penalties upon those who do not surrender the management of such vessels to other persons, not so licensed; if it has so excluded any others, it is because it considered that *508 the examination, appointment, and license of steamboat pilots required the interference of Federal authority, the States having omitted to provide specially for them. It is undoubtedly true that a pilot, duly examined and licensed under the Act of Congress, may be unfamiliar with the dangers of the harbor into which he is conducting the vessel under his charge; but it may. be equally true that the State pilot skilled in all those dangers may be utterly ignorant of the management of a vessel propelled by steam, for there is nothing in any State law requiring his acquaintance therewith.
The very respectable Board of Commissioners of Pilots, I presume, would not license a pilot who might be called upon to pilot steamers, unless he had such knowledge as would enable him to do so skillfully; but the law does not require it, and the Act of Congress does not make their decision as to such qualification binding. There is, therefore, no consideration extrinsic to the language of the Act of Congress to control its meaning; it professes to make new provisions “ instead of the existing provisions of law for the inspection and equipment of steamers and the present system of pilotage of such vessels,” (§ 9;) and pilots for steamers are thereby rendered incapable of being licensed except by the two named Inspectors, (§ 9, sub. 10,) and a penalty is inflicted upon any persons not so licensed for acting as pilots of steamers. Such law does not exclude State pilots from acting as pilots of steamers, if they have passed the ordeal of such examination by such Inspectors, and been licensed; nor would it interfere with any State law, which should enable those of its own pilots who were licensed under the Act of Congress, /who should first hail a steamer, to recover its pilotage. They might take the direction of a vessel from a pilot licensed by the United States law, who was not a State pilot, and give it to another who was, without interfering with the former, and the vessel would then be under the control of one who was skilled in avoiding both evils—'ignorance of managing a steamer, and of the difficulties of the harbor; because the evil intended to be guarded against by the United States law would then be prevented, and its exigency would be satisfied; but if the yielding of either law to the other was to be controlled by the superior magnitude of the evil remedied, it would require some deliberation to de *509 termine whether an ignorant engineer, or a person unacquainted with the coast, harbor, tides, and winds, was the most unsafe person on whom to rely.
The State law cannot take the control of a steam vessel from a licensed United States pilot, and give it to a State pilot not so licensed. In this case a pilot was actually taken on board having both qualifications, but that circumstance does not affect the right in this case. The plaintiff cannot recover this penalty for not taking him on board, and surrendering the control of the vessel to him under a State law, when the vessel became subject to a penalty for doing so under the United States law.
T have assumed that the State law compels the steamer not only to take the pilot on board, but to surrender the control of the vessel to him; for without that he would not be pilot, but mere adviser; and the words “ take a licensed pilot,” in the 29th section of the Act, undoubtedly include this compulsory surrender, otherwise it would not be pilotage paid for, but advice.
I fully concur in the view taken in Chapman v. Jackson, (9 Rich. Law R., 209,) that the Act of Congress of 1852 does not supersede or contravene the laws of the several States regulating pilotage, or deprive the States of the right to regulate it, but it does deprive them of the right of taking the control of a steamer from a licensed pilot of the United States, and giving it, through fear of a penalty, to any one not so licensed. As I have already stated, the State may take from one so licensed, and give to another so licensed such control, and it may designate what other qualifications the latter shall have. So, too, the Act of 1789, as to other vessels than steamers, and in reference to all matters except those provided for by the Act of 1852, was not repealed; the argument ab inconvenienti is equally strong against taking a State pilot knowing nothing of steam navigation, and against a United States pilot knowing nothing of the harbor he is entering. The fact whether there was, or was not, a pilot licensed by the United States Inspectors, was immaterial as to the taking of a subsequent licensed pilot.
These views render it unnecessary to consider the question whether the Act of Congress, giving coterminous States the power of appointing pilots for the waters which separate them, (V. Statutes at Large, 158, 154,) would or would not exempt the *510 defendant from this penalty, and whether it was incumbent on the plaintiff to prove that the vessel was not within the jurisdiction of the State of New Jersey when he offered his services; and also how far the jurisdiction of each State, without any Act of Congress, or under that of 1789, which limits it to “bays, inlets, rivers, harbors, and ports of the United States,” extends, and whether such State can define its own jurisdiction, or rather enlarge it indefinitely. It would undoubtedly seem to be rather too liberal an exercise of power to bring a vessel within seven miles of the coast of the State of New Jersey, but forty miles from the nearest point of the coast of the State of New York, within the exclusive jurisdiction of the laws of the latter State, in the face of the Act of 1837 before cited.
On the other hand, I apprehend that under the State laws alone, it is no defense to the penalty for not taking the first pilot that the delinquent vessel took another. I do not see that the State law can be constructed into a mere police regulation as it stands; it might be, if it only required the pilot to be taken on board; but as it requires the vessel to be surrendered to him, it clashes with the United States regulation, and becomes void.
For these reasons, I think judgment should be rendered for the defendant, with costs.
Woodruff, J.
That the Congress of the United States, by virtue of the provisions of the Federal Constitution, (Art. 1, § 8, sub. 3,) has power to prescribe rules and regulations, which shall embrace the subject of pilotage, is claimed by the defendant in this case, and is conceded by the plaintiff’s counsel; and that the power to regulate commerce embraces this subject is, I apprehend, fully settled.
When this power is fully exercised by Congress, all State legislation must yield to its enactments, which, by force of the Constitution, are of paramount authority.
Until Congress saw fit to act in exercise of the power, the States were at full liberty to adopt such regulations for the government of the subject within their own jurisdiction respectively, as they deemed proper.
By the Act of August 7th, 1789, the Congress of the United States, either in recognition of this power in the States, or to *511 place it beyond doubt, expressly authorized the several States to regulate the subject of pilotage within the bays, inlets, rivers, harbors, and ports of t^he United States, lying within their respective jurisdiction.
Under this situation of the power and legislation of Congress, our State pilotage system, (which began in 1693,) has been matured, and been sustained in force, without interference by our National Legislature down to the year 1837.
And it is clear, I think, that the power of this State over the subject is entirely ample and unabridged, whether it be regarded as residing inherently in the State jurisdiction, until Congress, in exercise of the Constitutional power, should assume its regulation, or as derived from the Act of Congress, expressly conferring it, except so far as the subsequent legislation of Congress is inconsistent therewith.
It is going too far to say that, because the Constitution has conferred upon Congress the power to regulate commerce, that power is necessarily exclusive, and renders all State legislation, which may properly be called a commercial regulation, void. It is void so far, and so far only, as it conflicts with the laws of the United States.
This conflict may arise either in the terms of the laws themselves, ór from a necessary implication. For example, if the Acts of Congress cover a particular subject in full, so that rights, privileges, or immunities plainly grow out of conformity to those Acts, the States can neither legislate in express contravention thereof, nor can they superadd conditions or restrictions, which shall, either incidentally or impliedly, operate as a modification of those Acts.
So it is going too far to say, that when Congress has legislated upon one topic, embraced within the power to regulate commerce, this is an exercise of the power, and thereupon all State legislation must cease. As to all provisions relating to the topic of national legislation, State laws inconsistent therewith mu'st yield; but other topics remain appropriately within the authority of the State, until Congress shall legislate further. For example, under the power to regulate commerce, Congress may and does sustain and regulate the light-house system. It would hardly be claimed, if no other commercial regulations existed by United States law, that the States were powerless to enact any.
*512 ' So, in relation to a particular subject, as for instance pilotage, it is going too far to say that, by legislating upon it in some one particular, Congress has taken all power over the subject, in any of its details, and in particulars not covered by such legislation, from the States, and that they can make no regulations; however consistent with the Acts of Congress, and capable of operating in entire harmony therewith.
This is especially true where Congress has itself, ■ by express enactment, declared that the States shall have power to régulate a particular subject.
And therefore, when the Act of 1789- is taken into view, the proposition is incontestible, that the power therein declared to be vested in the States, over the subject of pilotage, remains, so far and so long as Congress does not withdraw that power, either by an express repeal, or by legislation inconsistent with its exercise. And the laws of the States will, and do remain in force, except so far as they are modified or abrogated by laws of the United States, which, are inconsistent therewith. And so also, in the absence of express words of repeal, the Act of 1789 remains in force, except so far as subsequent Acts of Congress are inconsistent therewith. (New York v. Milne, 11 Peters’ R., 158; Cooley v. Port Wardens of Phil., 12 How. U. S. R., 299; Gibbons v. Ogden, 9 Wheaton R., 207; Hobart v. Drogan, 10 Peters’ R., 108.)
• These general principles bring me to the inquiry upon which, in my judgment, this case alone depends: Are the Acts of Congress of March 2d, 1837, and August 30th, 1852, inconsistent with the laws of New York, regulating pilotage; and if so, how far does that inconsistency extend, and alter or repeal our State laws ?
Placing my opinion, in the ease before us, upon a single point, as will hereinafter be seen, it will not be necessary that I should consider this question in all its details.
And for the like reason, it will not be necessary for me to express any opinion on the question, whether this State,' in defining the pilotage ground, or in making it the duty of vessels to accept the services of the first pilot who offers his services, although that offer be made at sea, far beyond the jurisdiction of the State, has exceeded its power.
*513 It is proper to say, that our State pilotage system is the growth of years of anxious attention to the best interests of commerce at this port, and of high regard to the safety of life and property. It has been perfected under the care and conduct of large experience and mature wisdom, and it is not to be lightly condemned. Some of the particulars, in which the laws were complained of in this case, are in the highest 'degree calculated to promote ambition, energy and efficiency among our Pilots, and by awarding a just reward to the highest vigilance, to promote the safety of all vessels which approach our harbor, and so largely to benefit our commerce, and protect the lives of our citizens and our visitors. And there is, to my mind, no satisfactory reason why, if the power to regulate the subject at all still exists, this State may not say that all vessels who enter this port shall pay pilotage to the first pilot who offers his services, having all the requisite qualifications. Whether such offer may be made at a distance from port, beyond our jurisdiction, so as to bind the vessel to receive the pilot on board, or whether it may not be necessary that the pilot so offering should continue ready to serve and keep himself within call, to the time when the services of a Pilot are needed, or our State jurisdiction is reached, is a question admitting of discussion. It could hardly be claimed that our Pilots can visit a foreign port, and there tender their services, and make it the duty of ship-owners to receive them and bring them home, or pay pilotage if they refuse to do so. And there may be a limit to the seaward, beyond which our State cannot bind vessels to receive and bring home Pilots. Possibly, the duty to actually receive the Pilot on board cannot be made to arise until the vessel reaches our jurisdiction; but even that concession would not invalidate the law which requires that the Pilot first offering his services shall be received, or be paid the pilotage, if he is ready to perform the service when that jurisdiction is reached.
By the Act of 1837, (U. S. Statutes at Large, vol. 5, p. 153,) Congress authorized the master of any vessel coming into a port situated upon waters which are the boundary of two States, to employ a pilot who was duly licensed under the laws of either of such states. This undoubtedly operated as a modification of the Act of 1789, and the State laws regulating pilotage, so far as *514 ¡such State laws were inconsistent with such Act of 1837, if any such inconsistency existed; and thereafter it could not by any law of the State of Kew York be made indispensable, under all circumstances, that a vessel coming into the port of Kew York should receive on board a pilot who was licensed under the laws of .this State.
If, when the Kew York pilot offered his services, a Kew Jersey pilot was already on board, the former could not claim a right to bring in the vessel; nor could any law of Kew York compel the payment of pilotage to him, if he was not employed to do so.
But this Act of 1837, is not so consistent with our port regulations as to repeal them entirely in respect to their requirement, that the first pilot who offers his services be employed, or be paid his pilotage.
As among our own pilots, this regulation still remained lawful and proper, certainly within our own jurisdiction.
When the master or owners of a vessel shall reject the services of a New York pilot, and shall afterwards accept the services of a New Jersey pilot, the question will arise whether, under the Act of 1837, the master or owners have a privilege of selection between Kew York pilots and Kew Jersey pilots, which is inconsistent with the regulation that he who first offers shall be employed.
The present case suggests no such question. Here one Kew York pilot was rejected, and afterwards another Kew York pilot, who was also duly licensed under the Act of Congress, was employed. And (subject to the question I have above noticed, whether a master can be, by any State law, compelled to take on board and bring in a pilot at any place on the ocean to which he may venture?) I have no doubt the Act of 1837, left the regulations entitling the pilot who first offers his services, to receive the pilotage, as between our own pilots, operative and legal.
Indeed, the true and proper construction of our State laws, and the regulations of the Board of Commissioners of Pilots, limits their operation to Kew York pilots; and the requirement that vessels shall take a licensed pilot, and that pilotage shall be paid to the pilot first speaking or offering his services, must be understood and construed in view of the law that authorizes the mas *515 ter of a vessel coming to this port to employ a New Jersey pilot. I think, therefore, that so far as the claim of the plaintiff here depends upon the effect of the Act of 1837, it is not prejudiced thereby.
The Act of Congress of August 30th, 1852, in amendment of previous enactments having the same general object, was designed, as its title indicates, to provide greater security to the lives of passengers on board of steamers. It is claimed, and insisted, on the one hand, that this Act is wholly inconsistent with the State laws concerning port pilotage, and operates as a repeal or abrogation thereof; and on the other hand, that it was framed and intended for a totally distinct and different purpose, and does not affect the subject of port pilotage at all; and the plaintiff’s claim, as last stated, is supported by the deliberate judgment of the Court of Appeals of the State of South Carolina, in Chapman v. Jackson. (9 Rich. Law R., 209.)
That the Act of 1852 has primary and principal reference to the condition and conduct of steam vessels on their voyage, I think is quite clear. But that it has reference to their condition and conduct during their whole voyage, is, I think, not less certain. The security to life intended to be provided was tó operate during the continuance of the dangers to which life was exposed.
Accordingly, the first section of the Act in clear terms declares that no license, register, or enrollment shall issue until the provisions of the Act are complied with; “ and if any such vessel shall he navigated with, passengers on hoard, without complying with the terms of this Act, the owners thereof and the vessel itself shall be subject to the penalties contained in the second section of the Act to which this is an amendment.”
The succeeding seven sections relate to precautions against fire, pumps, boats, and life preservers, to be taken and carried on board; the means of escape from lower deck, the carrying of gunpowder, camphene, turpentine, and other dangerous articles, and the stowage thereof when carried; and then, in the ninth section, the Act provides, “ that instead of the existing provisions of law for the inspection of steamers and their equipment, and instead of the present system of pilotage of such vessels, and the present mode of employing engineers, the following regulations shall be observed, to wit
*516 The Collector, Supervising Inspector, and District Judge of the several designated Judicial Districts, within which are important commercial ports, are to appoint Inspectors, who are empowered and required to perform various duties specified in the subdivisions following: the first six of which provide for the examination and testing the hull and the boilers, and machinery ; the certificate of approval, the licensing to carry gunpowder, &c., and the keeping of a record of their certificates and licenses; and the seventh subdivision provides that the Inspectors shall license and classify all engineers and pilots of steamers carrying passengers. The eighth then provides for the examination and licensing of engineers; and the ninth, that “ when any person claiming to be a skillful pilot for any such vessel, shall offer himself for a license, the said Board shall make diligent inquiry as to his character and merits, and if satisfied that he possesses the requisite skill, and is trustworthy and faithful, they shall give him a certificate to that effect, licensing him for one year to be a pilot of any such vessels, within the limit prescribed in the certificate.”
Subdivision ten enacts, that “ it shall be unlawful for any person to employ, or any person to serve, as engineer or pilot on any such vessel, who is not licensed by the Inspectors,” and adds a penalty.
And section 88 of the act provides that all engineers and pilots of any such vessel shall, before entering upon their duties, make solemn oath * * * to be recorded * * * that he will faithfully and honestly, according to his best skill and judgment, perform all the duties required of him by the act, &c., &c.
And section 44: All parts of laws inconsistent with this act are repealed. (U. S. Statutes at Large, vol. 10, [Little and Brown’s Ed.,] pp. 61-67.)
I cannot avoid the conclusion, that this Act has principal reference to the pilots in charge of steamers on their voyage, and that it was not intended, even in respect to steamers, wholly to abrogate the various systems of port pilotage which exist under the laws of the several States. In order to affect such abrogation in the absence of words of repeal, the inconsistency between the Act and those State laws should be of the same character, and as irreconcilable as would be necessary to a constructive *517 repeal of a previous Act of Congress, since laws regulating pilot-age, passed by the States after the Act of 1789, may be said to have the sanction of Congress itself. But in so far as such inconsistency does appear, the State law must yield.
In the first place, it is manifest that port pilotage was not, as a system, in the view of the National Legislature. The general subject of the security of passengers on vessels navigated by steam was the topic of legislation.
The Act does not in any wise relate to sailing vessels, and in so far as they are concerned the State system is clearly unaffected.
The qualifications of a port pilot demand that he have a thorough knowledge of the particular channel and harbor where he is to perform his duties, with its bars, banks, tides, currents, soundings, and its various fluctuations and changes, which can only be gained and preserved by constant and diligent study, experience and watchfulness; and yet the qualifications of the Inspectors, by whom pilots are to be examined, and licenses or certificates to pilots are to be given, as enumerated in the Act, do not embrace any knowledge on that subject; and what is still more conclusive, as well suggested in the case of Chapman v. Jackson, above cited, if this abrogates the system of port or harbor pilotage, there is nothing appearing on the face of the Act which forbids the Inspectors for the District of New York from giving a license that would authorize a pilot to take a steamer into the port of New Orleans, or any other port of the United States, though the pilot be wholly unacquainted with it, and when the Inspectors themselves are wholly incapable of judging of his qualifications therefor, if they desired to test his knowledge. In respect to this branch of the inquiry, I am disposed to concur with the opinion of Mr. Justice Munro, in the case above cited. And that it would be in the highest degree unreasonable to suppose that Congress would, when legislating for the safety of passengers, make such provisions that the Act might be fully complied with, and yet, during what is often the most difficult part of the voyage, the pilot be utterly unfit to direct the course and management of the vessel; and yet there is great force in the suggestion, that when, under the Act of Congress, a pilot has the certificate therein mentioned, “ licensing him for one year to be a, pilot of .any *518 such vessels within the limit prescribed in the certificate,” such license is absolute and conclusive according to its very terms, whether, in this respect, the enactment was a wise one or the contrary.
.But while I am inclined to concur with much of the reasoning in the case cited, I think the conclusion that the act of 1852 does not operate at all upon the subject of harbor or port pilot-age, unwarranted. It may be, and I think must be conceded, that the provisions of the act primarily relate to the pilot or person who is to direct the course of the vessel on her voyage—it clearly includes him. There seems to me, however, no just reason for saying that it is confined to him.
Before the Act, there were pilots whose profession and employment was the bringing of vessels into the port or harbor. There were also pilots who were charged with the management of the helm, and directing the course of the vessel on her voyage. 'Congress, by the act in question, designed to furnish additional security. This was done by requiring that all who should “ serve as pilot on any steamer carrying passengers ” should submit themselves to examination, and first obtain the license or certificate mentioned in the act. That examination manifestly relates to familiarity with vessels propelled by steam and their machinery, and the management thereof; and one who may not serve as pilot on board a steam vessel, can neither conduct her through her voyage, nor on any part of it.
It is impossible to say that when Congress enacted that no person not licensed under the act shall serve as pilot on such vessel, they included one class of pilots, and not another performing duties of the same nature, and attended with like risks and hazards.
If it was important that the ship should be under the guidance of a pilot having the prescribed qualifications, when at sea, how can this Court say that it was less important that the ship should be in the same manner protected at the begining and end of the voyage ? If the claim of the plaintiff be allowed, viz.: that the ship may be required to take a pilot at sea, out of sight of land, no one can say it is not as important that he be skilled in navigating vessels propelled by steam, as it is that the pilot in any previous part of the voyage be so. And, again, some ports are so *519 situated at a distance from the open sea, and are reached by so circuitous and difficult an approach, that skill in the management of a steamer is of indispensable importance; and, to my mind, the Act of Congress includes all pilots of steamers. It intended to superadd, as a requisite to entitle any person to serve as such pilot, into port, on the voyage, or out of port, that he be proved competent in the particulars referred to in the act, and obtain the license therein mentioned. While, on the other hand, it does not prevent the operation of port regulations under the State laws, so long as they do not require owners of steam vessels to take a pilot who has no such license; and it does not prevent the licensing of port pilots, among whom, for the piloting of steamers, shall be those who have the qualifications required by the Federal laws.
This construction of the Act seems to me eminently reasonable and beneficial.
Before the Act of 1852, under the operation of our State laws, the owners of steamships were under the necessity of taking any pilot who offered, whether he had any knowledge of the management of steam vessels or not, and though wholly ignorant of the construction or operation of their machinery, or the peculiar facilities or inconveniences in promoting their safe conduct; and this, no doubt, led to the anxiety of such owners to be permitted to make their own selection, or to have some security that the pilots whom they were required to confide in were properly qualified in these respects.
True, they could secure the assistance of two pilots, one of each class; but both could not control the ship, and the pilot in charge could not be compelled to yield to the directions or opinions of the other.
Under the construction of the Act which I have stated, it may be necessary to have two classes of port pilots, one of which, being licensed by the laws of the United States, and also by the Board of Pilot Commissioners, are alone authorized to bring a steamer carrying passengers into port, while the other class may, as heretofore, pilot sailing vessels without a license under the Act of Congress; and owners of steam vessels, and passengers, may now have the assurance that they shall not be subjected tothehazard of the management of any pilot, in any part of the voyage, who *520 has not the due qualification in respect of the management of steamships which the Act of Congress contemplates.
And it is no unreasonable burden upon port pilots duly licensed under the State laws to require them to procure the further evidence of fitness to pilot a steamship provided for by the Act oi Congress, before they shall be permitted to serve upon such a vessel while carrying passengers.
My opinion, then, rests upon this single ground:
The plaintiff in this action was not, by the Act of Congress of 1852, a competent pilot. It is by that Act made unlawful for any person to employ, or any person to serve, on any such vessel, who is not licensed by the Inspectors.
The plaintiff had no such license, and the owners were not only not bound to endanger their vessel or the security of the passengers by employing him, but they would be subject to penalties if they had done so; and, in the face of that Act, no State legislation could make it their duty to employ him, or make it lawful for him to serve.
If not, he could be entitled to no compensation by reason of his offer to serve, or of their refusal to permit him to do so.
The defendant is, therefore, entitled to judgment.
Judgment for defendant.