## SUPREME COURT—IN ADMIRALTY.

### R. COADY *et als. vs.* 1,200 BARRELS OIL, 15,000 POUNDS BONE, ETC., ETC.

After essential services have been rendered to a vessel, yet the subsequent misconduct of the salvor may not only diminish the amount of his reward, but his entire claim may be forfeited.

Persons attached to a ship, which has been wrecked, may claim as salvors, when their services exceed the proper duty of seamen, and when their connection with the ship has been *de facto*, or, by operation of law, dissolved.

R. Coady *et als. v.* 1,200 bbls. Oil, 15,000 lbs. Bone, etc.

No fixed rule for the ascertainment of the rate of Salvage. The circumstances entitled to most consideration are, the value of the property saved, the extent of the service and the degree of merit and gallantry in accomplishing the enterprise.

Except in extraordinary cases, a moiety of the property saved is the highest compensation, which Courts of Admiralty are in the habit of awarding.

ALLEN, C. J.

This was a libel for salvage, filed by Richard Coady and others, the owners of the whaling bark " Italy," for themselves and the officers and crew of said bark, for alleged services in saving from the ship " Natchez," in the Summer of 1857, lying a wreck in Potter's Bay, in the Ochotsk Sea, and abandoned by her master and crew, a large amount of property, particularly enumerated in said libel ; also, for services rendered by the bark " Harmony " to the ship " Natchez," in placing said wrecked ship in a comparatively safe position in Potter's Bay, in the Ochotsk Sea, in the Autumn of 1856, and to her master, officers and crew, by furnishing them passage to this port.

And Isaac Wrisley, third officer, and John M. Lockman, as fourth officer of said ship " Natchez," intervening for themselves and their companions, Charles E. Ripney, boatsteerer, and Isaac Bunce, carpenter, but now deceased, and who, they believe, has one brother and two sisters in New York city, for their interests in said property libelled, for services rendered in the preservation of the property aforesaid, while in Potter's Bay, from the time of its wreck till possession was taken of it in Potter's Bay by the mate of the " Italy," in July last past.

Also, of George W. Willfong, second officer of the bark " Harmony," intervening for his interest in said property, libelled for services rendered in the preservation of the property aforesaid while in Potter's Bay.

It is alleged in the libel that all the rights and claims of salvage which may be adjudged as belonging to the owners of the bark "Harmony," shall be awarded to the libellants in pursuance of an agreement made by Richard Coady, the owner of the " Harmony," and one of the libellants. It is alleged, also, and not denied, that the owners of the " Italy " have entered into a contract with the officers and crew of said ship, in which they agree to pay to them, according to the stipula-

R. *Coady et als. v.* 1,200 bbls. Oil, 15,000 lbs. Bone, etc.

tions of the shipping articles, a certain lay on all the oil, bone, etc., which may be awarded them.

Messrs. Bates, Harris and Griswold for the libellants.

Messrs. Davis and Austin for the intervenients Lockman and others.

Mr. Hinton for the intervenient Willfong, second officer of the "Harmony."

Mr. Montgomery for the claimants.

This suit has occupied nine days in its investigation, and has been most elaborately and ably argued by the learned counsel engaged for the several parties.

The testimony introduced is substantially as follows, viz :

The ship " Natchez," of New Bedford, sailed from the Sandwich Islands in March, 1856, and proceeded to the Ochotsk Sea, where she continued in the whaling service until October, 1856. That on preparing to return to the Islands, at the end of the season, she encountered a gale of wind, and put into Potter's Bay for shelter, let go both anchors, but they could not hold the ship, and the masts were then cut away to save the lives and property, the vessel being in about four fathoms, and striking at low water at both ends, with the wind blowing on shore, then in about 56 ° 30' N. latitude.

Potter's Bay is about thirty miles deep, and the " Natchez " was about three miles up the bay at the time she struck, on the west side. If the spars had not been cut away, the ship would have been in danger of being lost on the night of the disaster, and, if left as she was then through the Winter, she was in danger of going to pieces. The next morning the " Harmony " was discovered, and Capt. Bellowes went on board of her, there being no vessel in the vicinity excepting her. He stated that he had lost his ship, the " Natchez," and wanted Capt. Hempstead to take him and his crew to the· Islands, which Capt. Hempstead refused, unless Capt. Bellowes could furnish him with sufficient provisions, being already short.

Capt. Hempstead returned in the boat with Capt. Bellowes on board the "Natchez," and afterwards went to the "Harmony," and proceeded up the bay, about fourteen miles, and anchored. The anchors of the " Natchez" were then weighed, and the vessel kedged out with an anchor got from the "Harmony,"

until she was in the middle of the bay, close to the "Harmony." The "Natchez" was then towed up, and one of the "Harmony's" boats was engaged in assisting. The "Harmony" also sent her boats on board the "Natchez" for provisions, to supply the crew of the "Natchez" on board the "Harmony," on their way to these Islands, and also for the sick men.

The "Natchez" came to anchor about ten miles from where the "Harmony" lay, on the northwest side of the bay, and the next morning the "Natchez" was run ashore on the flat in the bend of the land, and hove as far on as she could be at two successive high tides. The bottom of the "Natchez" was in good condition, and no leak at the time of leaving her, except about fifteen feet of her false keel gone forward and ten aft. The mate and second officer proposed to the captain to rig jurymasts, the second or third day after the "Harmony" came to their assistance, which was in the morning after the masts were cut away. At the time of the proposition to rig jury-masts, the "Harmony" had done nothing except lending a kedge anchor, because the wind was so strong it was feared the "Natchez" would go ashore if she was moved. It would have taken a fortnight or three weeks to have rigged jury-masts.

It was a matter of importance to get the anchor from the "Harmony." The "Harmony" would stow some one thousand eight hundred to two thousand barrels of oil, and bone in proportion, and could have taken nearly the whole of the oil and bone of the "Natchez," and brought it to Honolulu, in addition to what she had on board of her own ; the weather at the time being such that it might have been transhipped as well as the provisions, and could have been done in four days by the two crews. During the towing, sometimes one and sometimes two of the "Harmony's" boats were employed. The "Natchez" had five boats of her own, which, with her full complement of hands, would have been able to tow the ship.

Capt. Bellowes then ordered all the crew of the "Natchez" on board the "Harmony," and they all went except Lockman, Wrisley, Ripney and Bunce, who pulled on shore. Previous to leaving the ship, the mate asked Capt. Bellowes what he was going to do with the property, and he said he had sold it to

Capt. Hempstead, and that he should abandon the ship, the mate protesting against it. The mate wanted to go ashore, but Capt. Bellowes ordered him into the boat, saying that he would take pretty good care that he did not. It was in evidence that he had sold the ship to Capt. Hempstead for $100 or $150, and that the persons present at the sale were the two masters and Lockman, Wrisley and Bunce.

After the sale of the vessel, the men were getting their things out, and Capt. Hempstead asked Lockman what he would take to stop by the wreck ; and it was ultimately agreed that Wrisley, Bunce, Ripney and Lockman should stay by the vessel upon receiving each one-twentieth part of all there was belonging to the ship and cargo saved, after which Capt. Bellowes, standing on the gangway, said : "I abandon the ship to the winds and the waves." This was on the 15th October, nine days after she struck. All persons attached to the "Natchez" then went on board the "Harmony," except the four men that went ashore.

The crew of the "Natchez" were ten days on board the "Harmony," up to the time of leaving, and forty odd days in coming to Honolulu, where she arrived on the 1st or 2d of December, 1856.

The "Harmony" was more liable to danger by remaining in the bay at that season, than she would have been in ordinary whaling weather.

There were one thousand two hundred barrels of oil on board at the time the "Natchez" struck, and eighteen thousand pounds of bone.

Lockman, Wrisley, Bunce and Ripney, after going on shore, returned on board the same night, where they remained until the last of November, when, in consequence of a heavy north-easter, which afterwards hauled to the northwest, they drifted off from three to five miles, the bay being full of ice at the time, and at the same time parting her starboard chain and the anchor was lost. After this she continued to drift for three days, until the larboard anchor, swinging backwards and forwards against her bow, chafed the ring stopper off, and the chain ran out and held her with the larboard anchor. Not deeming it safe to remain longer on board, they made several

attempts to get on shore, but were unsuccessful, being at the time from three to five miles off.

At length they went ashore as far as they could in their boat, and then left her and went on the ice, and proceeded to their house on shore.

The vessel still continued drifting for ten to fifteen days, until the ice closed up solid, she dragging her larboard anchor.

In January sometime she parted her larboard anchor, they being all on shore at the time, and the vessel being in view of their house. It was not considered advisable to shackle the chain at that time, because if they had done so, it would, in all probability, have been frozen round by the ice and parted again.

That Bunce, Wrisley and Lockman shackled the chain in the month of April, Ripney being sick at the time.

That Bunce, one of the party, died on the 26th June, after having been sick with fever twenty days.

During the Winter, a Cossack, in company with an Indian, crossed the head of the bay, from Ayan to Nicolaessky, with the mail. In ten or fifteen days they returned with a letter from the Governor of Nicolaessky, of which the following is a copy :

"Town of Nicolaessky, River Amoor, Dec. 22–3d.

"The Governor of this place having heard that a whaleship has been cast away near the Ochotsk Sea, and that there are a portion of the crew yet alive, sends by these Indians warm clothing and food ; and if you are disposed, you can follow them to this settlement, about one hundred and fifty miles from where you are. Here you will be cared for.

N. A. Khitrovo,

"Secretary of Russian Imperial Government."

Addressed "To any of the crew of a whaler cast away in Shantar Bay."

Upon receipt of the foregoing letter, Lockman proceeded in company with the Cossack to Nicolaessky, where he saw the Russian Governor, who asked him why he was in Shantar Bay, and what he was there for; and he replied that he was wrecked there, and that he was left by the captain to take care of the property. Upon which the Governor asked him if the vessel

was fast; and he replied that it was no use making her fast until the ice was gone. The Governor then said the Cossack had found the ship abandoned and no one on board, and that by rights she belonged to the Russian Government; but that as we had stopped there, he would not take it, but would protect us. The Governor then instructed the Cossack to tell the natives not to touch us or go near the ship; but he said that anything they might have already taken, it would be impossible to get back. After that they met with no interference from the natives.

The "Italy" sailed from Honolulu in March, 1857, and returned to Honolulu the 2d or 3d of November, 1857. She carried more than the ordinary number of men required in the whaling service, in order to save the property of the " Natchez."

The mate of the "Italy" left her at Mercury Head on the 2d July, and proceeded to Potter's Head, and having landed on the sandspit and proceeded to where some.smoke was seen, he discovered Lockman, Wrisley and Ripney, and the next day they all proceeded on board the "Natchez," which was found four miles from where she had been left in the previous season, full of water at high tide, and decks partly covered with water, wood-ends partly started, plank and sheathing gone, and in bad condition—a wreck. She could not have been moved with safety to the property on board, nor could she have been put afloat after the removal of the property. She was made fast to one anchor and chain and lying aground. She was moored by being on the ground.

Capt. Babcock instructed the mate to pay the men, if they were found in possession of the vessel, whatever their agreement was with Capt. Hempstead or Capt. Bellowes. Capt. Babcock afterwards agreed that Lockman should have $1,000 upon his arrival in Honolulu, but the amount has never been paid. Mr. Lockman applied to Mr. Coady for it on his arrival in Honolulu, but he refused to pay more than $500, which he, Lockman, declined accepting.

These men had a house on shore and another near the mouth of the Bay, where they could see ships coming in. The "Italy" was six or seven miles from the " Natchez," where she anchored. She arrived there on the 20th July.

R. Coady *et als. v.* 1,200 bbls. Oil, 15,000 lbs. Bone, etc.

The "Natchez" being gurried all over with the oil inside, it made it very difficult to work down between decks. It was difficult to save the property on account of having only one hour, or so, tide. Kanakas had to dive for the bone into the lower hold; the oil had to be towed during the night as well as the day, and the men got but little sleep in consequence; most of their victuals were cooked on board of the "Italy" and sent to the "Natchez." The wreck would have been very unsafe during the last ten days of the wrecking in case of a blow. Nothing else could have been saved by remaining longer by the wreck. It was supposed by the mate that 6,000 or 7,000 pounds of bone was still on board the wreck when they left her. While the mate was on board the "Natchez" there were whales seen every day from the time of the "Italy's" arrival, and while there, previous to the "Italy's" arrival at her anchorage, he, with Mr. Ripney, got a whale; it was about the 9th of July.

Several shipmasters testified that the weather was generally good in Potter's Bay in the months of July and August.

Capt. Green, of the "Sheffield," states that he was aware of the wreck of the "Natchez" being in Potter's Bay, and had had an idea at one time of wrecking her; but that Mr. Coady had told him that the "Italy" had been fitted out for that purpose, by order of the owners, and he then abandoned the idea.

The third officer of the "Italy," Mr. McClintock, testifies that during her voyage they took seven or eight whales, but did not catch any after the 16th August. That after leaving the "Natchez" they lowered frequently, but did not get any; and during the time the first officer was away looking for the "Natchez," they continued whaling as usual, but were unsuccessful.

The main force of the "Italy," from the 20th July until her departure down the Bay on the 16th August, was occupied in wrecking the "Natchez" and in their preparations for departure. Several ships visited the mouth and lower part of Potter's Bay during this season.

Mr. Durham, the clerk of R. Coady & Co., testified to the correspondence between Messrs. Coady & Co. and the owners; on the arrival of the "Harmony" at the port of Honolulu, that

R. Coady & Co., the owners of a portion of the "Harmony," parties to the libel, addressed a note to Messrs. S. Thomas & Co., agents of the ship "Natchez," in which they give an account of the disaster; of the ability of the "Harmony" to have brought a great portion of the oil and bone to Honolulu, and that they intended to fit her out for a whaling cruise, with carpenters and crew sufficient, and all things necessary to bring the "Natchez" into port, if she would float; and they should expect reasonable salvage. They repudiate the sale from Bellowes to Hempstead as illegal. The letter is very honorable to them, and the owners represent themselves highly gratified with the honorable course of conduct pursued by them. They referred Messrs. Coady & Co. to Mr. Waterman, their agent, whom they had directed to confer and co-operate with Messrs. Coady & Co. in the recovery of the ship and cargo. They, however, subsequently decided not to send the "Harmony," but, by the co-operation of the other libellants, fitted out the "Italy" for a whaling voyage, and for the purpose of wrecking the "Natchez," for she was regarded as better adapted to the purpose.

Mr. Durham further testified that the "Italy" sailed for $15,668 02, including advances to the crew, etc., of $2,273 44, and that she brought into port an amount of property from the "Natchez," which he valued at $39,854 26, and that her own catchings are valued at $12,000.

It was agreed by the counsel that the average catchings of the fleet during the last few years, had been about 825 barrels of oil, with the usual proportion of bone, which, by the same estimate, would be worth here $26,400.

I propose to examine the several claims for salvage in the order in which the services were rendered; and the first were those of the "Harmony." The history of the whole proceedings by her master, and the amount of service rendered by this vessel, are fully detailed in the sketch I have given of the testimony.

It is a clear proposition of law, as well as of morals, that salvors may be curtailed, or even deprived altogether of their salvage remuneration through error, misconduct, or want of skill and capacity in the performance of a salvage service. In

the case of the "Duke of Manchester," 2 W. Robs., 471, the court expressly declares that when essential services have been rendered to a vessel, the subsequent misconduct of the salvor may not only diminish the amount of his reward, but his entire claim may be forfeited. This doctrine was distinctly laid down by Lord Stowell in the case of the "Medina;" and in the case of the "Neptune," 1 Rob., jr., 297, the court declined to give any salvage at all, the Trinity Masters having pronounced that the asserted salvors had been guilty of gross negligence, if not of willful carelessness, in allowing the anchor to be let go, and in keeping the course of the ship to the north, when she should have gone to the south.

The authorities fully sustain the principle of the forfeiture or dimunition of salvage by misconduct. (See the "Joseph Harvey," 1 C. Rob., 306 ; the "Barefoot," 1 Law and Eq. Rep., 661 ; the "Glory," 2 Law and Eq. Rep., 551; the "Cape Packet," 3 W. Rob., 122.)

The case of the "Barefoot" presented these facts : That she was laden with lead and iron, sunk on Shipwash Sand, and was there left by the master and crew. Held, that the ship was not a derelict, that the authority of the owners and under-writers remained ; and the first finders, though they recovered part of the property, forfeited their claim to salvage, and became liable to the costs of a suit instituted by them as salvors, by reason of the subsequent misconduct towards and forcible resistance to the authority of the owners. (See for the authorities on this point — "Elizabeth and Jane," Wall, 38 ; the "Glasgow Packet," 2. W. Rob., 306; the "Dosseitie," 10 Jurist, 865 ; the "Duke of Manchester," Ib., 863 ; the "Neptune," 1 Rob., 297.)

The principle is well settled that salvage may be forfeited by aggravated misconduct on the part of the salvors, such as spoliation, smuggling, or gross neglect. (6 Wheaton, 152.) The "Belle Corunne's" claims for salvage were pronounced against for erroneous and improper conduct. (The "Dryden," 5 Eng. Ady. Rep., notes of cases, 116.)

A joint action of two sets of salvors, viz : The crew of the smack "A," the primary salvors, and the crews of six other smacks, for salvage in respect of services rendered to a foreign

ship in getting her off the Long Sand, dismissed on the ground that the primary salvors, who had boarded the vessel prior to her striking on the Sand, had acted erroneously, and had by the means they adopted caused the vessel to get on the Sand. On a subsequent application to the Court on behalf of the other salvors, whose services had been rendered after the vessel had got on the Sand, and who had not in such services recognized the prior acts of the primary salvors, £200 was awarded to them, with costs, on a value of £7,500. Had the claims of the second salvors been founded in any degree on the original error of the first salvors, no services which they might have rendered afterwards, however meritorious, would have entitled them to derive a benefit from the error of misconduct of the first salvors. (Prichard's Adm. Dig., 375, § 133.)

The sale of the vessel to the master of the "Harmony" is regarded by the libellants as invalid—of which there can be no legal doubt, for the ship had been placed in a position which was regarded by them as comparatively safe ; and, if so, there was a strong probability of saving the whole property, which was of great value. And for whom ? Not for the owners of the "Natchez" certainly—otherwise there would have been no sale, but there would have been a faithful effort to have wrecked the "Natchez," and taken from her all the property which the "Harmony" could have brought to Honolulu. And it is admitted that it was the duty of the master of the "Harmony" to have done it.

The testimony of Mr. Dyer, the first officer of the "Natchez," and Mr. Willfong, the second officer of the "Harmony, that the vessel had ample capacity to have brought most of the oil and bone and other property on board, and that by the aid of both crews the transhipment could have been made in four days, or at farthest it would have taken them no more time than they occupied in placing the "Natchez" in her Winter berth.

Was there a collusion in the sale of the vessel and cargo for one hundred dollars ? and was the vessel safely anchored for the Winter, and, as it were, laid aside for future use ? If so, there was no service worthy of salvage compensation. In this case there would be an entire want of good faith and an honest purpose to save the property for the benefit of the owners.

It has been argued by the libellants, that although the master ought to have perfected the salvage service at the time, and that he is not worthy of compensation, still the owners and crew should not suffer by the want of good faith, reasonable skill, and sound discretion of the master. The master has the entire authority in the government of his ship; confidence in his discretion, integrity, and qualities for his peculiar command are reposed in him, and the consequences for all these, or want of them, necessarily result to the owners who have employed him, and to the crew who serve under him. The neglect to take this property on board the "Harmony" was the fault of the master. That the owners are responsible for the conduct of the master is a general principle of law; and they are often liable for the wrong doings of the master—at any rate, in a case of salvage service, if there is any loss from the want of good faith, discretion and energy of the master of the salving ship, it certainly should not be imposed upon the innocent and absent owners of the property wrecked. Suppose the master of the "Harmony" had done nothing, and the officers and crew had earnestly solicited the master to perform this salvage service, it will not be contended that they should be rewarded for salvage service for their good intentions, on the ground that they were desirous of doing their duty, but the master prevented. So in this case, the service was not rendered at the time in which it was in the power of the libellants to perform, but they subjected the property to great hazard and loss by the delay. Had the cargo been removed from the "Natchez" at that time, and she had been anchored where she was, she would have, doubtless, remained there, and ultimately been taken to a port for repairs—at Ayan, perhaps—if not, to this port.

It has been likened to a case of embezzlement of some portion of the cargo by some of the salvors, where the forfeiture only follows the act of the individual, but does not apply to the ship's company. The authorities sustain no such analogy, neither does sound reason. Each person suffers for his own crime, but the owners and crew must take the consequences of a want of good faith and of good judgment of the master. Whoever undertakes to save property are responsible for the exer-

cise of those good qualities, and to subject to unnecessary hazards, delays and loss, is a violation of duty as salvors, and the consequences must attach to all who are connected with the transaction, no matter whether they are principals or agents. To entitle men to salvage remuneration, they must do their duty in the best manner they are able under the circumstances. Has it been done in this case? It is admitted that it has not. This is only the common experience of men who suffer from inconsiderate or faithless agents.

Had a salvage service been faithfully done ; had there been good judgment, and an honest purpose, the property would have been brought from the wreck in the Autumn of 1856 to this port, and probably the ship saved without very material injury to her hull, and a liberal salvage remuneration would have been awarded. As it is, the owners, officers and crew are not entitled to any. It is true that, in meritorious claims for salvage, courts always regard them with favor ; but when there is an evident indication of a disposition to take advantage of the unfortunate, or to subject the property to hazard for ulterior and selfish purposes, it can not be too strongly rebuked.

The next question for the consideration of the Court is, are the seamen who were attached to the ship and remained by the wreck, till the necessary aid by the master and crew of the " Italy " was tendered, entitled to any compensation ?

It is alleged by the counsel for the claimants, that they having been attached to the ship " Natchez," could not legally render a salvage service.

All the authorities sustain the doctrine, that persons having been attached to a ship which has been wrecked, may claim as salvors when their services exceed the proper duty of seamen, and when their connection with the ship in the capacity in which they shipped had been *de facto*, or by operation of law dissolved. (The " Two Catharines, 2 Mason, 219 ; the " Neptune," 1 Hagg. Ad., 227–237 ; Mason *vs.* " Blaireau," 2 Cranch Rep., 240 ; Hobart *vs.* " Drogan," 10 Pet. Rep., 108–122 ; Hand *vs.* schooner " Elvira," Gilpin's R., 60 ; the " City of Edinburgh," 2 Hagg. R., 333.)

In the case of Mason *vs.* " Blaireau," it appears that the ship was abandoned on the ocean by the master and crew, with the

R. Coady *et als. v.* 1,200 bbls. Oil, 15,000 lbs. Bone, etc.

exception of one seaman, who was left on board either by accident or design, and who co-operated with others, by whom the ship was afterwards found, in bringing her into port; he was allowed by the Court to share in the salvage.

It is further contended that, as they, or a portion of them, were witnesses of the invalid or fraudulent sale, they are not entitled to any compensation. They positively swear that they knew nothing about the sale until called into the after cabin. They say they supposed that the masters of the ships knew how to do such business. After the sale by the master of the "Natchez" to the master of the "Harmony," the latter made a contract with these seamen to stay and guard the property during the winter, or until relief was sent them. It was a severe and somewhat dangerous undertaking to remain on that inhospitable coast during a winter. I see no reason to believe that they acted dishonestly. They certainly have conducted with energy and courage, and have done very material service to the wreck. What the result would have been if the chain had not been shackled before the ice broke up, is uncertain; still all will agree that the ship was much more liable to drift out of the Bay without the anchor than with it. The ship and her stores, and all else on board, were exposed to the natives; these intervenients were custodians. After the letter was received from the Governor of Nicolaessky, Mr. Lockman went to see him, and stated to him their condition and that of the property, and it will be seen that he then gave instructions to the Indians and all others to respect these men and the property under their charge. His generous conduct to these men reflects honor upon himself and his Government. It was an act of humanity which will be warmly appreciated by the people whose flag the ship bore. They were nearly nine months engaged in this service. It appears in evidence that the master of the "Italy" thought Mr. Lockman's services were worth $1,000, and gave him an agreement to pay him that amount. Mr. Bunce died a short time before the arrival of the "Italy," in the month of June; his services were equally meritorious with the others, and his heirs are entitled to whatever may be awarded in consideration therefor. A contract made with a person without authority, as with the master of the "Har-

mony," who claimed under an invalid title, has no binding force on the libellants or the claimants. The agreement with Capt. Babcock, so far as appears, was made understandingly ; but as it was not complied with, the interveners have appealed to the courts. I do not regard these agreements as fixing the rates of compensation, neither do they alter the nature of the service, as a salvage service ; it is still a salvage contract, and entitled to a salvage compensation.

The next question in order are the claims of the "Italy ;" and in presenting his view of the measure of damage, the counsel very properly declares that each case stands on its own footing, and must be decided according to the peculiar circumstances attending it, refers to the following cases, viz : Mason *vs.* "Blaireau," 2 Cranch, 240. This case was very carefully examined by Chief Justice Marshall, and he gave a very able opinion upon it. It appeared in evidence that the ship "Blaireau" came in collision with a Spanish seventy-four gun ship, was seriously injured, and was abandoned on the high seas by her officers and all her crew except one man, who was left either by accident or design on board. The next day she was boarded by the ship "Firm," bound on a voyage from Lisbon to Baltimore, of the actual burden of 500 tons, and of the value of $10,000, with a cargo of salt of the value of $4,000. Upon taking possession of the "Blaireau" she had about four feet of water in her hold, and could not have swam more than twelve hours longer. There was great risk and peril in taking charge of her. She was brought into the Chesapeake Bay after a navigation of nearly three thousand miles, by six persons who went on board of her from the "Firm," and the man who was found on board. Part of her cargo was taken out to lighten her forward, and put on board the "Firm," and part of it shifted aft. The "Blaireau" was navigated by the people of the "Firm," without boat or anchors. She was obliged to be pumped in fair weather by all hands, every two, three or four hours, half an hour at a time, and in blowing weather every hour, a quarter of an hour at a time. Her bow was secured by coverings of leather, copper and sheet lead, nailed on, and pitch and turpentine in large quantities poured down hot between the planks and the coverings. The labor of working the

R. Coady *et als. v.* 1,200 bbls. Oil, 15,000 lbs. Bone, etc.

"Blaireau" by the men on board was great and severe, and they had frequently thought of abandoning her, but fortunately persevered. She was a slight built vessel, and constructed without knees, and was very weak. The forestay was gone, and the foremast was secured by passing a large rope through the hawse holes and securing it to the foremast-head. It was the opinion of several experienced sea captains that the bringing in the "Blaireau" was a service of great risk and peril, and nearly desperate, and such as they would not have undertaken. The "Blaireau" and her cargo produced net $60,272 68, and the court awarded for the salvage service $21,400.   (The "Henry Ewbank," 1 Sumner, 413 ; Schooner "Emulous," ib., 214 ; the "Reliance," 2 Hagg., 91 ; Sprague *vs.* 140 bbls. Flour, 2 Story, 195 ; 5, 6, Rob., 322 ; Abbot on Shipping, Notes, side page, 555.

The "Ewbank" was found derelict ; she was freighted with cargo and rice, bound to London from Charleston, S. C.; she met with severe disaster and lost her rudder ; she was abandoned on the 12th March in lat. 42 ° 4' N., and in long. 53 ° 50' W., by the master and crew, and at the time completely unmanageable ; her cargo was shifting and she was waterlogged, and in imminent peril of foundering from the nature of her cargo and her further situation.   On the first day of April she was discovered by bark "Hope," in lat. 40 °, long. 54 °, who concluded to undertake the enterprise of getting her into port. She was without rudder, and nine feet of water in her hold.   A new rudder was constructed, but it did not answer the purpose, and the ship was steered by her sails ; continual pumping was required. This state of things continued to May 1, when they fell in with the brig "Padang" of Boston, bound to New York. The crew of the "Ewbank" were in a state of great discouragement and exhaustion, and in want of provisions, and were entirely willing to give up the whole enterprise. After some negotiation with the master of the "Padang," it was concluded to make an attempt to fix a new rudder and to get the "Ewbank" into port.   A new rudder was constructed, and hung in a very ingenious and skillful manner, and a new crew having been found, from the "Padang" and the "Ewbank," she proceeded on the voyage and arrived in Boston on

the 3d day of June. The "Padang" remained by the "Ewbank" until the rudder was hung and arrangements made for the voyage, having had her in tow part of the time. Justice Story awarded in this case, to all the salvors, a moiety.

The "Emulous" was a schooner laden with mahogany, logwood, coffee and hides, on a homeward voyage from ——— to Boston—struck on a reef at Robinson's Hole, on Nashawn Island, in the Vineyard Sound, on the 8th of February, and was so much injured that she immediately filled with water; immediate assistance was rendered from the shore, and the cargo was landed; the vessel was hove off from the reef and left at anchor, but capsized during the night. With a good deal of exertion and perseverance, and some considerable risk, she was brought into the harbor of Edgartown.

The district court decreed to the libellants $1,200; value of schooner and cargo being $5,722 38. From this decree the claimants appealed to the circuit court, and Mr. Justice Story reduced the amount to $850, which is a little more than one-seventh of the property saved. In his decision he adverts to the case of the "William Beckford," also cited by the counsel, and he says that the property was in great distress, and the circumstances more perilous than those of the present case, though somewhat resembling them. Lord Stowell decreed a salvage of £1,000 out of a property worth more than £17,000, as an ample remuneration. I am not sure that I should have arrived at a result so moderated and measured.

I will not give further detail of the authorities, for they conform to the same general principles as to the allowance of salvage. The counsel for the libellants having suggested that it was of great practical importance to the whaling fleet in the Pacific, that a very large salvage should be given, and as this was the first suit for salvage services ever tried in this Court, it would necessarily have great weight as a precedent. They further maintain that the Court is under no obligation to regard the rules and principles of the maritime law in other countries, for their application here would tend to error, as the circumstances of the navigation in this great ocean are so different from the Atlantic. It is true circumstances differ, but principles never. It has been truly said by an eminent jurist, that "a

R. Coady *et als. v.* 1,200 bbls. Oil, 15,000 lbs. Bone, etc.

judge must have more than ordinary boldness, or confidence, or presumption, who will venture to cast himself adrift from all rules and laws upon the broad ocean of discretion, without taking counsel of the wisdom of his predecessors." With him I can truly say that I have not the slightest inclination to adventure upon such a course. The ships "Natchez," "Harmony" and "Italy" were under the American flag, and the owners of neither can very reasonably be dissatisfied if the principles and decisions of their own courts, so eminent for learning and experience, are applied to them. That this case is important as a precedent may be true, but it certainly does have very little weight if the Court, in its decision, will not regard the authorities of courts in the United States and in Europe, so eminent for learning and experience in cases of this sort, and especially when their own citizens are involved. The principles of the maritime law are very well settled on the general question of salvage. The anxious solicitude which the Court feels in suits in admiralty of this character, arises from the *enlarged discretion* they have in making their decisions. Each case has its peculiar history. The difference of facts in each case makes the difference in result. Some cases are of imminent peril to the lives of the salvors, as well as to their ship ; others are not dangerous, but laborious. The property saved is sometimes very great, and sometimes very small.

It is argued that unless very large remuneration is given, wrecked property will be left to perish. · This may be, and if those who are engaged in the whale fisheries can obtain more of value from the sea than they could from a wreck, with the same labor and hazard, and in the same time, the public lose nothing; or if a Court of Admiralty decree to them the extraordinary amount indicated by the counsel, it is hardly worth the time and expense for the unfortunate owners to present their case to the Court. It would be virtually a decree of the whole property, in all this class of cases to the salvors, and hence it would be a matter of no consequence to the owners whether their property was rescued or not.

In cases where mariners are in peril and distress on the wreck, and the salvors rescue them, their gallantry will always enhance the salvage compensation. Fortunately this case has no such

element. It was a creditable commercial enterprise, combining the double purpose of a whaling voyage and wrecking the "Natchez." The ship "Italy" was employed in her legitimate business with all her force, till the 2d day of July, when the 1st officer and a boat's crew left for Potter's Bay to ascertain the condition of the wrecked property, and during the first twenty days of July she was employed in whaling, as opportunity offered. There were other ships at the mouth of the bay, but none went so far up as she did, and she would not have gone up so far for that object alone. This deviation occupied time which might have been more profitably spent, so far as whaling was concerned. Their whole force was occupied in wrecking and in preparations for departure, from that date till the 16th of August, when she sailed from the bay and cruised the balance of the season in her regular whaling business. It was in evidence that August and September were favorable for the business of whaling. It is impossible to have any fixed rules for the ascertainment of the rate of salvage. Each case has its own peculiar circumstances and considerations. Mr. Justice Story says that "the subject is necessarily one in which the reward must depend upon a just estimate of all the circumstances of each particular case." The circumstances entitled to most consideration are, the value of the property saved, the extent of labor and services, and the degree of merit and gallantry in accomplishing the enterprise. The latter, in an especial manner, is looked to by the Court with uncommon favor. Lord Stowell says that the fatigue, the anxiety, the determination to encounter danger, if necessary, the spirit of adventure, the skill and dexterity, which are acquired by the exercise of that spirit, all require to be taken into consideration. What enhances the pretensions of salvors most is actual danger which they have incurred. It is certainly a proper matter of consideration, the amount of property put at hazard in the salvage service.

It has been truly said that it rests in the discretion of the Court. But a sound discretion is not the arbitrary will of the judge. It is his duty to be governed by principles of law and sound reason.

In this case, the only remaining question is as to the amount of salvage. It has been a meritorious service, and attended

with difficulty and hard labor. It was not a case where any especial gallantry was required, but it did require good judgment and persevering industry. No persons were in peril, and the property was in the vessel at anchor, a portion of which, from the quantity of water in the vessel, it required the peculiar experience of the Hawaiians to rescue.

In the case of Biarde and others, 1 Story, 525, Chief Justice Story remarks, that "the highest compensation which courts of admiralty are in the habit of awarding, in the most meritorious cases, is one moiety. There are exceptions, indeed, but they are where the property saved is very inconsiderable, and the gallantry and danger and difficulty of the service have been so great as seemed to require an extraordinary compensation, hardly to be measured in value.".... "And indeed a moiety has rarely been given except in cases of derelict."

It is true that this is not a case of derelict, for a portion of the intervenients were of the crew of the ship "Natchez," and who are worthy of compensation for services beyond their agreement with the owners of the "Natchez." That can only arise, says Mr. Justice Story, when there has been an abandonment by the master and crew, without any intention to return to the wrecked property. In this case four of the crew remained by her, and exercised care and supervision over her from the day the master and the rest of the crew left her, on the 15th day of October, till the first officer of the "Italy" took possession of her on the 3d day of July following.

It is in evidence that the master abandoned her formally to the winds and the waves, although he made a sale of the ship and all the property on board to the master of the "Harmony," for one hundred dollars. The inconsistency of these acts are as palpable as the want of good faith or good judgment in making the sale. Neither the express abandonment nor the sale can be regarded as of any legal effect, under the circumstances, any further than to exonerate the seamen from any further obligations under their maritime contract. The property has never been treated, either by the salvors or owners, as derelict, which is fully proved by the correspondence of Mr. Coady and the owners. It does not appear that there was any uncommon peril to the "Italy" and her crew. There was no

hazard of life, no storms were encountered, and the season was mild; and at that season there was no especial danger to the "Italy;" still the labor was exhausting, and required great vigilance by night and by day, and abstinence from rest, as they were obliged to raft the oil and bone from the "Natchez" to the "Italy," some miles. In addition, the voyage was long, and the preparations more than for an ordinary whaling cruise. The intervenients encountered the perils and privations of an extra northern winter, and the labor they did upon the ship was hazardous and of material service.

The question then arises as to the amount to be awarded to the intervenors, Lockman and others, for their services.

It appears, in evidence, that the master of the "Italy" gave one of them—namely, Lockman—an obligation to pay him $1,000. I do not think this forms an exact criterion by which to award compensation; still, the proposition accords very well with my own judgment of the amount to be awarded to each of them.

It was stipulated by the parties to the suit, and an application made to the Court therefor, that the oil and bone saved from the "Natchez" should be partitioned by the Marshal and distributed as the Court shall decree, and that the balance of the property shall be sold at auction, on short notice, and the proceeds paid into Court, and so much as may be necessary to pay the costs of the Court deducted, and the balance distributed in the same proportion as the oil and bone.

In view of all the circumstances of the case, the Court is of opinion that the libellants and intervenients are entitled to one moiety of the whole property saved; and have accordingly decreed that four-tenths shall be delivered to the owners of the bark "Italy," (including the officers and crew, who are to be paid by the owners, according to their contract, for their salvage services,) and that one-tenth be distributed equally between the intervenients, Lockman and others, or their representatives.

The crew of the "Natchez" having intervened for their lay or share, the Court decreed that the remaining five-tenths, belonging to the claimants, be held in the custody of the Marshal until the further order of the Court.

And a sale of the balance of the property as specified in the libel will be ordered, and the proceeds thereof, after the Marshal has deducted his own fees, commissions and expenses, paid into Court; and after deducting the costs of court, will be distributed in the same proportions as the oil and bone were distributed.

The claim of the intervenient, Willfong, dismissed without costs.