114

**MILTON v. THE BLUE GOOSE.**
No. 7357.

United States District Court
E. D. Virginia, Norfolk Division.
June 1, 1950.

R. Arthur Jett, and Henry E. Howell, Jr., Norfolk, Va., for libellant.

R. M. Hughes, Jr., and Harry E. McCoy, Jr., Norfolk, Va., for respondent.

HUTCHESON, Chief Judge.

This proceeding is based upon a libel in rem in a case of salvage, civil and maritime, against the Yacht Blue Goose. The facts are as follows:

The Blue Goose is a pleasure schooner yacht, approximately 70 feet long, with an auxiliary diesel engine, originally of 150 horse power but due to its age and mechanical condition at the times here referred to incapable of developing full power when operating. At the time the libel was filed she was at the plant of the Norfolk Shipbuilding Corporation at Norfolk, Virginia, and within the jurisdiction of this Court. The libellant is a seaman who claims salvage against the yacht based upon the facts hereinafter stated.

During October 1949 the yacht was purchased by the present owner, Norman S. Walker, in New York, for an agreed price of $10,000.

Mr. Walker, who at the time was 24 years of age, had seen service in the Navy

during the late war but the record is silent concerning any other qualifications as a seaman. Mr. Sullivan, the grandfather of the owner, at that time 74 years of age, advanced the sum of $8,000, of which amount around $6,000 was applied to the purchase price and from the remaining amount the yacht was provisioned in contemplation of a cruise to the Caribbean Sea, to extend over a period of some four to six months. After purchasing the yacht the owner agreed with Milton, the libellant, who is an experienced seaman and the holder of a master's license qualifying him to undertake the voyage later described, to join the yacht on the voyage from New York to Miami, Florida. A steamer operating in the fruit trade, of which the libellant was master, was laid up for repairs at Miami and it was the desire of the libellant to return there for the purpose of taking charge of the steamer. The agreement between the owner and the libellant was that libellant would supervise the outfitting and provisioning of the yacht in New York for a fee of $10 per day for his services while so engaged. Thereafter he would accompany the yacht from New York to Miami as a workaway in the capacity of sailing master, although the owner was recognized as the master of the yacht. Libellant was to receive no compensation for the voyage other than transportation and subsistence. One Morrison was also engaged to serve in the capacity of cook and deckhand. Morrison was to continue on the voyage beyond Miami to the Caribbean Sea. His status was also that of workaway, he to receive no compensation for his services other than transportation and subsistence. The remaining members of the party were the owner, Walker, Mr. Sullivan, and one other passenger who had agreed to make a contribution toward the expenses, the amount of which was not developed at the hearing. There was also in contemplation the possibility of earning money during the course of the cruise by chartering the vessel, in which event either the original crew or other voluntary fellow adventurers who might be later recruited would be compensated. These plans were not well defined and in a rather speculative stage. In any event, the initial engagement of the libellant was only from New York to Miami and it was his expectation to leave the vessel at the latter point.

In November 1949, the vessel put out on the voyage without the libellant, he having failed to appear at the time scheduled for departure. Due to some difficulty the party returned and again sailed on November 18, 1949, at which time libellant was aboard. It was the purpose of the party to proceed through the inland waterway but on the day after sailing the motor ceased to function and the yacht was blown off her course by rough weather, which continued for two days. During that time the yacht was buffeted by high seas and lost her dinghy and shipped some water. As a result of the weather conditions the crew was unable to repair the motor and the vessel was without lights. About midnight of November 22, the yacht sighted the landfall of the Eastern Shore of Virginia, and proceeding without lights or power, passed through the Virginia Capes and arrived near Cape Henry, off Lynnhaven Inlet, around 3:00 or 4:00 o'clock in the morning, at which time she attempted to anchor. In undertaking to anchor one anchor was lost but the second anchor took hold. Libellant, Walker and Morrison, who were nearing exhaustion, retired to their bunks to sleep, although the vessel continued to roll in the rough seas, and the two passengers testified that it was necessary that they hold Walker in his bunk while he slept to prevent his being thrown to the deck.

As sunrise Mr. Sullivan and the other passenger, becoming alarmed about the condition of the vessel, aroused Mr. Walker and persuaded him to raise a distress signal. In response to the signal a Virginia pilot boat hailed the vessel and notified a boat operated by the Army which latter came alongside to remove the crew and passengers. At about this time libellant and Morrison were aroused and came on deck. Upon advice of those in charge of the rescue vessel and with considerable alacrity upon their part all aboard the yacht transferred to the Army boat. Be-

cause of the rough weather the two vessels were thrown together several times, tearing away portions of the yacht and breaking a hole in her side above the water line. At this time the yacht was dragging anchor but the anchor was not lost. The party from the yacht were taken to Little Creek and put ashore, where they communicated with the Coast Guard. They were advised by the Coast Guard that a Coast Guard vessel, The Raritan, was circling the yacht but before the vessel would undertake to board and bring her in it would be necessary that a representative of the owner be present. Walker had received an injury to his hand in leaving the yacht. Morrison expressed an unwillingness to accompany the Coast Guard and it was obviously impracticable for the two passengers to do so. Libellant thereupon volunteered to accompany the Coast Guard and departed in a surf boat for the Coast Guard cutter, which was at the scene. Upon arriving it was found that the sea was too rough to undertake to board the yacht from the surf boat and libellant boarded The Raritan. With two members of the Coast Guard, libellant transferred from the deck of the cutter to the deck of the yacht by seizing and clinging to the loose shrouds of the yacht as they swung across the deck of the cutter, when the yacht rolled in that direction. The shrouds consisted of heavy steel cables and the operation of transferring from one vessel to the other by this method was highly hazardous but safely accomplished by all three of the boarding party. They thereupon sawed off the anchor, got a line to the yacht and the cutter towed her to Norfolk and anchored her alongside the Sears Roebuck warehouse dock at Atlantic City. The Coast Guard cutter then left the yacht in charge of the libellant. After the departure of the cutter libellant observed that the yacht was taking water from the wash of passing vessels and arranged with Hudgins' Shipyard to move her to safer anchorage, near the entrance to the Hague. He also arranged with the watchman at the yard to pump the yacht during the night, if necessary. The other members of the party from the yacht had retired to a hotel in a state of near exhaustion. On the following morning (November 23) libellant returned to the yacht and found that it had been necessary that she be pumped during the night.

Thereafter at the direction of the owner the yacht was taken to the Norfolk Shipbuilding Corporation for repairs. The libellant assisted the owner in negotiating with the insurance underwriters by obtaining and supplying estimates, information and advice, without any further or additional agreement concerning compensation for his services, which were performed almost daily until December 2, when he was informed that his services were no longer needed. Libellant thereafter proceeded to Miami and subsequently, after necessary repairs, the yacht proceeded on the contemplated cruise.

At the time the party left the yacht on the morning of November 22, there were left aboard clothing worth a few hundred dollars, some articles of jewelry of small intrinsic value but of great and unestimated sentimental value, and an heirloom watch of Mr. Sullivan which had belonged to his grandfather and originally cost $750.

From the reported cases which I have examined it would appear that in order to justify an award for salvage there must have been an abandonment of the vessel and the services must have been of a voluntary nature. The cases further hold that under certain circumstances a member of the crew of a distressed vessel may be entitled to salvage. The C. P. Minch, 2 Cir., 73 F. 859; Elrod v. Luckenbach, D.C., 62 F.Supp. 935; The Superior, D.C., 270 F. 283; The Tashmoo, D.C., 48 F.2d 366 (involving a workaway); The Comet, D.C., 205 F. 991; The Victoria, 64 F.Supp. 370.

The C. P. Minch, supra, contains a comprehensive review of cases involving claims for salvage asserted by members of the crew.

While not a controlling fact in this case, I think it of sufficient importance to determine whether the libellant was a member of the crew of The Blue Goose. Emphasis has been placed upon the fact that he did not sign articles and was paid no money

compensation for his wages. Such services as he performed were in the capacity of what is known as a workaway.

■ Upon the question of salvage, I find no distinction between the status of the libellant and the status of a paid member of the crew. From libellant's own testimony it appears that he entered into an agreement in New York with the owner to assist in fitting and provisioning the vessel at a stipulated compensation per day while so engaged. At the same time and as a part of the same agreement he engaged himself to make the voyage from New York to Miami, to which latter place he was desirous of going, in return for transportation and subsistence, both of which were of value. The agreement was voluntary, the parties were strangers to each other and obviously libellant considered it to his advantage. There is no magic in the payment of money wages. For example, the member of the crew of a fishing vessel who is compensated by participating in the profits has as much obligation as a member of the crew as one who is paid a daily or monthly wage in cash. It is therefore my conclusion that libellant was a member of the crew of the vessel at all times referred to until his connection was terminated in Norfolk subsequent to the delivery of the vessel to the Norfolk Shipbuilding Corporation.

Thus, there is presented the main questions concerning the alleged abandonment of the vessel and whether libellant, as a member of the crew, is entitled to salvage.

At the time the party left The Blue Goose she was at Lynnhaven Inlet in the lee of Cape Henry and within the Virginia Capes. She had lost one anchor but the other one was still attached to the vessel, although not holding properly. There was testimony to the effect that she appeared to be drifting toward the open sea. There was a hole in her side above the water line. She had been hailed by a Virginia pilot boat and the Army boat which rescued the party had arrived on the scene. While not a part of the record, it is well known to mariners that the United States Coast Guard maintains stations, men and equipment for the purpose of responding to the call of distressed craft and that such response is prompt and the aid rendered is highly efficient. With ship to shore telephonic and radio communications it is only a matter of seconds or minutes at the most before a call for assistance can be made. While The Blue Goose was not so equipped, the pilot boat, the Army boats and the Coast Guard are. It is true that heavy seas were running but not too heavy to prevent the rescue of this party without resorting to the use of equipment such as a breeches buoy, although The Blue Goose received injury in the operation. Actually, the Coast Guard cutter had arrived on the scene and was circling the yacht by the time the party reached the Coast Guard station at Little Creek and two of the men from that same cutter boarded the yacht, along with libellant.

The picture thus presented is vastly different from that of a crippled derelict adrift at sea. The difference is recognized in the case of The Florence, 16 Jur., 572, quoted in 73 F. 863. It is to be borne in mind also that promptly upon arrival at the Coast Guard station the owner, along with others in the party, including libellant, appealed to the Coast Guard for assistance in rescuing the vessel. This was not the act of persons who had abandoned the vessel but more nearly similar to the facts in the case of The Luckenbach, supra.

■ Under the facts it is my conclusion that there was not such an abandonment of the vessel as made her the object of salvage although I doubt not that at the time of departure all members of the party were in a state of considerable alarm and excitement.

In view of these observations it is my conclusion that the vessel had not been abandoned and libellant, whether a member of the crew or not, is not entitled to maintain a claim for salvage.

As above indicated, it is my opinion that libellant rendered substantial services to the master of the vessel over and beyond the services anticipated when the agreement was entered into in New York. In connection with rescuing and towing the

vessel the services rendered were highly hazardous and not anticipated. While it is true that the Coast Guard would no doubt have towed her in without this assistance, this in no way detracts from the value of his services both in rescuing the vessel and in later removing her to a safer harborage, although the latter service was no more than what should have been expected under the circumstances. In addition to these services it is not denied that he was of material assistance to the master during the days which followed in connection with adjusting the insurance and arranging for necessary repairs.

Thus is presented the final question in the case; that is, whether libellant may be awarded compensation on a *quantum meruit* for the services so performed.

The libel asserts a claim for salvage and for general relief. There is no reference made to wages nor to special services performed. Under the facts there could be no claim for wages. The agreement made at New York provided merely that he should be afforded transportation and subsistence to Miami in return for services. He was transported to Norfolk and furnished his subsistence until arrival there. The delay occasioned by the accident was unavoidable and excusable so far as the master was concerned. Libellant did not await the completion of repairs but proceeded to Miami and the record is not clear concerning the final termination of his agreement with the owner. In any event, there is no balance of wages due him.

Nor do I believe he can recover in this action on a *quantum meruit*. He was, in effect, a fellow adventuring member of the crew who had been promised the trip to Miami. When the voyage started it was anticipated that there would be a quiet cruise down the East Coast, through the inland waterways. Instead, there was a rough, outside voyage, without motor or lights, requiring extraordinary effort on the part of all hands aboard, including the episode of towing the vessel into Norfolk harbor and the necessity of arranging for extensive repairs. These were unforeseen hazards assumed by libellant when he

agreed to undertake the voyage. Upon the facts shown by the record, he is to be commended for both his seamanship and his conduct in his relation to the vessel, but he is not entitled to further compensation therefor.

The statements of facts and legal conclusions herein set forth are intended as findings of fact and conclusions of law in compliance with the pertinent rule. Should proctors for either party desire to submit additional or supplemental findings or conclusions consideration will be given such suggestions.