**MILTON v. THE BLUE GOOSE.**

No. 6180.

United States Court of Appeals
Fourth Circuit.

Argued March 15, 1951.

Decided April 2, 1951.

Henry E. Howell, Jr., and R. Arthur Jett, Norfolk, Va. (Jett, Sykes & Howell, Norfolk, Va., on brief), for appellant.

R. M. Hughes, Jr., Norfolk, Va. (Harry E. McCoy, Jr., Norfolk, Va., on brief), for appellee.

Before SOPER and DOBIE, Circuit Judges, and WATKINS, District Judge.

DOBIE, Circuit Judge.

Hans G. Milton filed a libel *in rem*, in a cause of salvage, civil and maritime, against the yacht Blue Goose, in the United States District Court for the Eastern District of Virginia. The District Court decided against the claim of libellant, Mil-

ton, and dismissed the libel. Milton has appealed to us. The opinion of the District Court is reported in 91 F.Supp. 114, 117, 1950 A.M.C. 1162.

The Blue Goose, a schooner yacht about 70 feet long, with an auxiliary Diesel engine of originally 150 horse power, sailed from New York in November, 1949. On board were Norman Walker, owner and apparently Master, Mr. Sullivan, Walker's grandfather, Mrs. Whiteside, a retired actress, Cyrus Morrison and Hans Milton.

Morrison and Milton signed no formal articles. Under an informal oral understanding with Walker, it seems that Morrison and Milton were to accompany the yacht as workaways, receiving transportation and subsistence but no wages. It was contemplated that Morrison, doubling as cook and seamen, was to accompany the yacht for a cruise in the Caribbean Sea; but Milton, an experienced mariner with a master's license, was to go with the yacht, as acting sailing master, only to Miami, Florida, where Milton was to take charge of a fruit steamer.

The day after sailing from New York, on the broad reaches of the Atlantic Ocean, the yacht ran into bad weather, with strong winds and high seas. Her engine ceased to function and could not be repaired, the yacht shipped water, lost her lifeboat and was without motive power or lights. About Midnight on November 22, the yacht sighted the landfall of Virginia. By using sails, the Blue Goose passed through the Virginia Capes and arrived, around 3 A.M. on November 23, at a point near Cape Henry, off Lynnhaven Inlet. There, after the loss of one anchor, in an attempt to anchor the yacht, a second anchor took hold. Walker, alarmed at the situation of the yacht, hoisted a distress signal.

In response to this distress signal, an Army boat came alongside the Blue Goose. Upon the advice of those on the Army boat, all those aboard the yacht were transferred to the Army boat and taken to Little Creek and put ashore. During this transfer, the Army boat and the yacht, due to the rough weather, were thrown together several times with consequent damage to the yacht. Efforts on the part of the Army boat to take the Blue Goose in tow met with no success and it seems that when the Army boat left the yacht, the yacht was beginning to drag her anchor and head toward the sea.

At Little Creek, the party from the yacht communicated with the Coast Guard and was informed that the Coast Guard vessel Raritan was circling the yacht but that before the Raritan would undertake any boarding of the yacht and towing her to safety, some representative of the owner of the yacht must go along and be present. Walker had injured his hand in leaving the yacht; Morrison was unwilling to accompany the Coast Guard, stating that he valued his life too highly for any such undertaking. Clearly, Mr. Sullivan, on account of his age, and Mrs. Whiteside, on account of her sex, could not go along. Libellant, Milton, thereupon volunteered to go along with the Coast Guard and help to have the yacht towed to safety.

Milton, thereupon, left Little Creek in a surf boat for the Raritan. When it became clear that the yacht could not, on account of the rough weather and high seas, be boarded from the surf boat, libellant boarded the Raritan. Together with two members of the Coast Guard, libellant transferred from the deck of the Raritan to the deck of the Blue Goose by seizing and clinging to the loose shrouds of the yacht as they swung across the deck of the Raritan, when the yacht rolled in that direction. These shrouds consisted of heavy steel cables but the hazardous boarding operation was safely carried out by all three of the boarding party.

Milton and the Coast Guardsmen sawed off the yacht's anchor and got a line from the yacht to the Raritan which towed the yacht safely to Norfolk, where she was left in charge of Milton, who arranged for a watchman and for the pumping out of the Blue Goose. Further, Milton assisted Walker in negotiations with insurance underwriters. On December 2, Walker informed Milton there was no further need for the services of Milton, who thereupon went to Miami. After necessary repairs were made to the Blue Goose at Norfolk,

the yacht proceeded on the contemplated cruise.

On these facts, counsel for libellant contends that libellant was not one of the crew of the Blue Goose but merely a member of a jolly party on the yacht; or, in the alternative, that even if libellant was a member of the crew, the yacht had been abandoned, and, on that score, libellant was entitled to a salvage award. Counsel for the Blue Goose, on the other hand, maintain that libellant was a member of the yacht's crew, that the Blue Goose had not been abandoned and that, consequently, libellant is entitled to no compensation for his services either for salvage or on a *quantum meruit*.

█ The District Judge, in his opinion, found: "Under the facts it is my conclusion that there was not such an abandonment of the vessel as made her the object of salvage although I doubt not that at the time of departure all members of the party were in a state of considerable alarm and excitement." We heartily agree that there had been no technical abandonment of the Blue Goose. Help was at hand and it was clearly contemplated that the yacht could be towed to safety. This seems clear from the testimony of Walker, Mr. Sullivan and Mrs. Whiteside. This was proved true by the happenings immediately subsequent to the time when the whole party left the yacht.

Though he denied any recovery to libellant either for salvage or on a *quantum meruit*, the District Judge, in his opinion, further stated: "Libellant rendered substantial services to the master of the vessel over and beyond the services anticipated when the agreement was entered into in New York. In connection with rescuing and towing the vessel the services rendered were highly hazardous and not anticipated." In the light of these findings, with which we agree, we think the District Court erred in failing to grant libellant an award for salvage and in dismissing the libel.

We think that Milton was a member of the crew of the Blue Goose from the time of her sailing from New York until the time when all of the party left the yacht.

He was, accordingly, not entitled to (and indeed does not claim) any salvage award for his services during that period. See, The Massasoit, 16 Fed.Cas. page 1070, No. 9,260. But, when the party landed at Little Creek, Milton owed no further duties to Walker or to the Blue Goose. Then, Milton was certainly under no obligation to wait around until the yacht could be repaired and to proceed with her to Miami. Milton, had he so desired, would have been within his rights had he then and there parted company with the yacht's company and proceeded about his own affairs.

In this connection, Morrison testified:

"Q. Did either you or Milton sign Articles? A. No, we did not.

"Q. You did not sign Articles, did you? A. No.

"Q. Then in so far as any agreement which concerned you, you could have disembarked from the vessel at any time you saw fit? A. Very definitely.

"Q. Did that hold true also with respect to Milton? A. Yes. In fact I can go further, on many occasions the subject of continuing, that is of all of us continuing, came up. Mr. Walker endeavored to persuade Mr. Milton to permit him to continue down indefinitely, for the whole voyage.

"Q. Did Milton agree to do so? A. He did not.

"Q. At any time either prior to or during the voyage did Mr. Walker or any one else indicate in anyway that you or Milton was bound to the vessel as seamen or crewmen under Articles? A. No.

"Q. I believe that the voyage was terminated unexpectedly? A. It was."

In like manner, Milton himself testified:

"Q. You have previously defined the term 'workaway' as used in sea parlance. What status do you consider that you occupied while you were sailing on the Blue Goose? A. I was a workaway from New York to Miami.

"Q. Did you consider yourself obligated to stay aboard the Blue Goose for any period of time after leaving New York?

A. Until the next port of call where I could leave if I wanted to."

And Walker, owner of the Blue Goose, testified: "We never had a situation of crew on the boat; it was all one party together."

■ Even a seaman is entitled to salvage when he contributes services aiding in the saving of a ship when these services are of such a nature that he is under no obligation to perform them by virtue of his role of seamen; when these services are extraordinary and unusual, beyond and above the call of duty. This principle has been enunciated in a number of cases. Thus, in Hobart v. Drogan (The Hope), 10 Pet. 108, 35. U.S. 108, 121, 9 L.Ed. 363, Mr. Justice Story stated: "But a pilot, as such, is not disabled, in virtue of his office, from becoming a salvor. On the contrary, whenever he performs salvage services beyond the line of his appropriate duties, or under circumstances to which those duties do not justly attach, he stands in the same relation to the property as any other salvor; that is, with a title to compensation to the extent of the merit of his services, viewed in the light of a liberal public policy. * * * Mr. Justice Thompson in the case of The Wave, Fed. Cas. No. 17,300, 2 Paine 130, cited at the bar, maintained the same doctrine, upon an elaborate view of all the cases. It has been also applied to another very meritorious class of cases, we mean that of seamen, who, in the ordinary course of things, in the performance of their duties, are not allowed to become salvors, whatever may have been in the perils or hardships or gallantry of their services in saving the ship and cargo. We say, in the ordinary course of things; for extraordinary events may occur, in which their connection with the ship may be dissolved de facto, or by operation of law, or they may exceed their proper duty, in which cases they may be permitted to claim as salvors."

In The Two Catherines, Fed.Cas. No. 14,288, 2 Mason 319, 338, this same Judge observed: "In my humble judgment, there is not any principle of law which authorizes the position that the character of sea-men creates an incapacity to assume the character of salvors; and I cannot but view the establishment of such a doctrine as mischievous to the interests of commerce, inconsistent with natural equity, and hostile to the growth of sound morals and probity."

And, in the case of The Umatilla, D.C., 29 F. 252, 257, District Judge Hoffman stated: "No attempt was made at the hearing to disparage the skill, courage, and devotion of the libelants. Their claim is resisted on the ground that, being seamen attached to the ship, their claim as salvors cannot be allowed. That seamen cannot, in general, be admitted to claim as salvors is well settled. The rule is placed by Lord Stowell on the ground that by the seaman's contract it is his 'stipulated duty to protect the ship through all peril, and to devote his entire possible service to that end.' For this service his only reward is his wages. He admits, however, that, in 'the infinite range of possible events, circumstances might present themselves that might induce the court to open itself to the seaman's claim for salvage'. The Neptune, 1 Hagg.Adm. 235."

See, also, the opinion of Chief Justice Marshall in The Blaireau, 2 Cranch 240, 268, 2 L.Ed. 266, in which the great Chief Justice, in allowing the salvage claim of a seaman, said: "There was certainly no individual who assisted in bringing in the Blaireau, that contributed so much to her preservation as Toole. Every principle of justice, and every feeling of the heart, must arrange itself on the side of his claim. But it is contended, that the contract he had entered into bound him to continue his endeavors to bring the vessel into port, and that the principles of general policy forbid the allowance of salvage to a mariner belonging to the ship which has been preserved. The claims upon him, on the ground of contract, are urged with a very ill grace indeed. It little becomes those who devoted him to the waves, to set up a title to his further services."

How applicable are these words to the instant case before us!

We have examined the cases relied on by appellee. These decisions, as applied to

the facts of the instant case before us, are not impressive.

We think that, in the light of what has heretofore been said and under the principles set out in the cases we have cited, the extraordinary and hazardous services performed by Milton, which materially contributed to the prompt and effective rescue of the Blue Goose, clearly entitle him to an award for salvage.

The decree of the District Court denying Milton any such award and dismissing his libel must, accordingly, be reversed. The case is remanded to the District Court with instructions to enter a decree in favor of an award to Milton for salvage of the Blue Goose, and to proceed to a determination of the amount of money to which Milton, as a salvor, is entitled.

Reversed and remanded.