REVISED November 10, 2009

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 29, 2009

Charles R. Fulbruge III
Clerk

No. 06-30930

LOUIS SOLANA; BRENDAN J. LALLY,

Plaintiffs–Appellants,

v.

GSF DEVELOPMENT DRILLER I, her engines, tackle, apparel, etc., in rem;
GLOBALSANTAFE DRILLING COMPANY; GLOBALSANTAFE CORP., in
personam; GLOBALSANTAFE HUNGARY SERVICES, LLC,

Defendants–Appellees.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, SMITH, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Louis Solana and Brendan Lally commenced an action in admiralty against GSF Development Driller I, her engines, tackle, and apparel, in rem, and against GlobalSantaFe Drilling Co., GlobalSantaFe Corp., and GlobalSantaFe Hungary Services L.L.C. (collectively GSF), in personam. Solana and Lally asserted that they were entitled to recover, as pure salvors, at least one percent of the value of a semi-submersible drilling unit. The district court granted summary judgment in favor of GSF. Although we agree with the district court

that the facts of this case do not support a salvage award, the present record does not support the district court's conclusion that, as a matter of law, the parties agreed that the plaintiffs would be compensated in the same manner that they had previously been compensated. We accordingly reverse the summary judgment and remand for further proceedings.

I

For purposes of reviewing the summary judgment that was granted in favor of the defendants, we accept the plaintiffs' assertions regarding the facts as true. The Development Driller I (DDI) is a semi-submersible drilling platform that was fabricated for use in the Gulf of Mexico, and its cost was in excess of $350,000,000. In the summer of 2005, the DDI was anchored in Grand Isle Block 91 but had never performed drilling services because its cracked, submerged thruster housings were damaged and undergoing repair. As Hurricane Katrina approached, GlobalSanteFe evacuated all of its jack-up and anchored rigs in the Gulf of Mexico, including the DDI, pursuant to its existing hurricane procedures. As part of that process, the DDI's power was shut off, and its crew was flown to the shore.

Prior to the events giving rise to this suit, Louis Solana had worked for GlobalSantaFe Drilling Company and its predecessor for almost twenty years. He had been permanently assigned to the DDI for more than two years before arrival of Katrina, initially serving as Senior Mate for about eight months before he was promoted to the position of Offshore Installation Manager, which was the senior marine officer and the equivalent of the DDI's captain. The parties dispute whether Solana maintained a 21-days-on, 21-days-off schedule while assigned to the DDI, but they agree that his service had been performed on at least a somewhat similar basis. He was in the midst of his time off when the

DDI was evacuated on August 27, but the parties agree that he had intended to return to the DDI on August 31 as the captain of its crew.

Brendan Lally had worked for GSF since 2003, had served on the DDI as a senior dynamic positioning operator and ballast control operator, and was evacuated from the DDI as Katrina was bearing down on it. Neither Lally nor Solana had signed ship's articles. They were at-will employees. They were compensated for time spent aboard the DDI but not for their time ashore. After Lally was evacuated from the DDI, he found lodging in Lafayette, Louisiana, for which he, not GSF, paid. The day after the evacuation, August 28, GSF requested that Lally travel to Houston, Texas to attend a seminar at a hotel on August 29, and he complied. That evening, he was asked by a representative of GSF, Randy Clevenger, if he and others who had been evacuated would "return to the DDI to attempt to save the vessel." Lally knew at this point in time that the drilling rig was listing as much as 12 to 15 degrees, which he said was "a much larger list than I have ever experienced aboard a semi-submersible drilling vessel." He normally kept the DDI trimmed to within a 1/4 degree of tolerance. Lally's affidavit states that based on the degree of the list in the wake of Katrina, "we all knew it indicated DDI must have sustained serious damage in the storm." Lally and a number of other crew members agreed to return to the DDI, but several did not.

Solana was in Nevada when the DDI was evacuated, but on August 28 he traveled with his wife to Houston at his own expense. The following day, GSF asked if Solana "would be willing to come in from [his] time off to lead a team of volunteers to save DDI." In Solana's words, "I was requested to have the team board dead DDI, restart her generators, conduct a damage assessment, keep her from sinking, and attempt to stabilize her. I agreed to lead the team." Solana's affidavit reflects that GSF maintained a description for the Offshore Installation Manager position that Solana held, and "[t]hose duties do not include boarding

3

a sinking, unstable drill unit to restore power, stanch flooding, and correcting her severe list, all in circumstances of grave danger."

The morning after GSF requested Solana, Lally and others to return to the DDI, the assembled team and Randy Clevenger were flown from Houston to Lafayette and then to the DDII, the DDI's sister vessel, which sustained little damage from the storm. En route, they passed by the DDI and saw that it was severely listing, was out of position, and was dragging anchors. After arriving at the DDII, Solana learned that none of the pilots of the larger helicopters were willing to ferry the group to the DDI because of its list. However, a pilot of a small helicopter agreed to transport a group of thirteen, two or three passengers at a time. The helicopter was unable to land on the DDI because its deck was sloping, and each group of the boarding team jumped from the airborne helicopter onto the DDI's deck. The last of the group was onboard the DDI by 4:00 the afternoon of August 30.

Within three hours, emergency power had been established, and by 6:30 that evening, the main power was essentially restored, although there were repeated blackouts. However, flooding was progressing and the situation was worsening. The team was gradually able to improve the vessel's trim and counteract flooding. They advised GSF of the extent of damage, and GSF engaged a professional salvage firm. That firm's salvage master boarded the DDI the following day, August 31, but due to the list of the drilling unit, it was not until the following day, September 1, that the professional salvage team came aboard the DDI to begin operations. Solana and Lally worked with the professional crew for the next few days, until September 5, when the platform was stabilized. Eventually DDI was moved to port, and final repairs were completed eight months later.

Solana and Lally sued GSF in the Eastern District of Louisiana, demanding payment as salvors of DDI. After discovery, GSF moved to dismiss

or, alternatively, for summary judgment. The defendants asserted that crew members are not entitled to a salvage award for assistance rendered to their own vessel and that though there are exceptions to this principle, Solana and Lally did not come within them. The defendants maintained that the DDI had not been abandoned, Solana and Lally returned to it to repair damage as part of the crew, and they were paid their usual salary for the time they spent on the DDI after Hurricane Katrina.

Solana and Lally responded by arguing that they were volunteers when they returned to the DDI post-Katrina; the drilling unit was in peril; they, along with professional salvors, were successful in saving it; and they therefore are entitled to pure salvage. Relying on general maritime law, Solana and Lally contended that in certain circumstances, crew members can be salvors.

In a brief supplemental response to the defendant's motion for summary judgment, Solana and Lally argued for the first time that the United States is a party to the 1989 International Convention on Salvage,[1] the DDI was subject to that Convention, and they were entitled to recover as salvors under article 17 of the Convention because there were no employment contracts in effect when they returned to the DDI following Katrina. At the hearing on the motion for summary judgment, counsel for the plaintiffs additionally noted that the DDI is registered in Vanuatu, which is also a signatory to the Convention. At the same hearing, the plaintiffs advanced an alternative argument urging the district court to conclude that if there was a contract pursuant to which Solana and Lally boarded the DDI post-Katrina, the court should consider whether the services they rendered exceeded their normal duties and would entitle them to a salvage award.

---

[1] International Convention on Salvage, Apr. 28, 1989, S. Treaty Doc. No. 102-12, 1953 U.N.T.S. 193.

The district court ruled from the bench at the close of the hearing. The court concluded that the undisputed facts established an oral contract and that Solana and Lally expected to be paid even if their efforts were unsuccessful. The district court cited a decision from the Eleventh Circuit[2] as supporting its holding but did not mention the Convention. The court subsequently entered a judgment in favor of the defendants. Solana and Lally have appealed.

II

We review the district court's grant of summary judgment de novo.[3] Summary judgment shall be entered in favor of the moving party if the record, taken as a whole, "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[4]

We first consider the contentions the parties have advanced regarding general-maritime-law salvage. In so doing, we wish to make clear that we are not determining whether the general maritime law in this area survives the Convention. We simply assume, without deciding, that general-maritime-law principles are applicable, since in this case, the result is the same irrespective of whether the general maritime law or the Convention determines whether a salvage award is owed.

GSF has maintained throughout this litigation that Solana and Lally were crew members and therefore are barred from recovering as salvors. The Supreme Court in Hobart v. Drogan expressed the general proposition that crew members acting in the performance of their ordinary duties, "imposed upon [them] by the law and nature of [their] employment," are not entitled to a

---

[2] Flagship Marine Servs., Inc. v. Belcher Towing Co., 23 F.3d 341 (11th Cir. 1994).

[3] James v. Tex. Collin County, 535 F.3d 365, 373 (5th Cir. 2008).

[4] FED. R. CIV. P. 56(c).

salvage award.[5] The Court explained that this proposition has been applied to seamen, "who in the ordinary course of things, in the performance of their duties, are not allowed to be come [sic] salvors, whatever may have been the perils or hardships or gallantry of their services in saving the ship and cargo."[6] The Court reiterated this proposition in a subsequent decision when it explained that "[s]eamen belonging to the ship in peril cannot, as a general rule, claim a salvage compensation, not only because it is their duty to save both ship and cargo, if it is in their power, but because it would be unwise to tempt them to let the ship and cargo get into a position of danger in order that by extreme exertion they might claim salvage compensation."[7] However, "extraordinary events may occur, in which [the seamen's] connexion [sic] with the ship may be dissolved de facto, or by operation of law, or they may exceed their proper duty, in which cases they may be permitted to claim as salvors."[8]

---

[5] 35 U.S. 108, 122 (1836).

[6] Id.

[7] The Clarita, 90 U.S. 1, 17 (1874).

[8] Hobart, 35 U.S. at 122; see also The C.P. Minch, 73 F. 859, 865 (2d Cir. 1896) ("From this review of the authorities, it is apparent that, in every case where compensation in the nature of salvage has been awarded to seamen, the voyage has terminated by the shipwreck of the vessel, which has either gone to the bottom or left her bones on the shore, or she has been abandoned by all, or by all except the salvors, under circumstances which show conclusively that the abandonment was absolute, without hope or expectation of recovery, or the seaman has been by the master unmistakably discharged from the service of the shipowner."); Kimes v. United States, 207 F.2d 60, 64 (2d Cir. 1953) (permitting crew of one ship that rescued cargo of another ship traveling in the same convoy to recover as salvors even though crew had received its regular pay); Bertel v. Panama Transp. Co., 202 F.2d 247, 248 (2d Cir. 1953) ("Since all of these libelants were members of the crew when the fire broke out on the vessel, they must show in order to recover salvage for what they did, however meritorious their conduct may have been, that they had been discharged from their obligations as such to the ship before they put out the fire."); see also 3A-VI BENEDICT ON ADMIRALTY § 70 (2008) (concluding that a seamen can recover a salvage award "[w]here the master has unmistakably discharged the seamen from the service of the shipowner and their contract of employment").

Solana and Lally contend that the bar prohibiting crew members from recovering as salvors does not apply in the present case because they were at-will employees and had no obligation to return to the DDI after Hurricane Katrina. They assert in the alternative that if they were crew members, their post-Katrina service far exceeded the contractual duties they performed pre-Katrina.

We agree that as at-will employees, Solana and Lally were not obligated to return to the DDI after it was evacuated. The service that they rendered to the DDI immediately following Katrina was not compelled by a pre-existing contractual obligation as at-will crew members.[9] However, Solana and Lally did not render service to the DDI when it was in distress as volunteers within the parameters of the law of salvage. In their respective affidavits, Solana and Lally state that when they were asked by GSF to board the DDI following Katrina, they expressly agreed to do so.[10] Although both state in their respective affidavits that they were "volunteers," the context of these statements makes clear that they were asserting that their prior service aboard the DDI did not obligate them to return and that they "volunteered" to return, as distinguished from some of the crew who declined to do so. As their briefing concedes, both Solana and Lally expected to be compensated by GSF for their efforts to stabilize

---

[9] See generally Milton v. The Blue Goose, 188 F.2d 285, 287 (4th Cir. 1951) (concluding that the claimant was a member of the crew until all left the yacht after she lost power during a storm and that the claimant could recover as a salvor for his efforts after returning to the vessel with the Coast Guard to save the yacht).

[10] Solana stated in his affidavit, "GSF contacted me and asked if I would be willing to come in from my time off to lead a team of volunteers to save DDI. I was requested to have the team board dead DDI, restart her generators, conduct a damage assessment, keep her from sinking, and attempt to stabilize her. I agreed to lead the team."

Lally stated in his affidavit, "On the evening of August 29, GSF asked if I would volunteer to return to DDI to attempt to save the vessel. I agreed to go."

the DDI after it was damaged by Katrina, regardless of whether those efforts were successful.

The Supreme Court has long recognized that a binding agreement to pay for salvage services irrespective of the success of the enterprise will defeat a claim for pure salvage.[11] The Court explained in The Camanche that while "it is not every agreement which will have the effect to diminish a claim for salvage compensation[,] . . . the rule is that nothing short of a contract to pay a given sum for the services to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will operate as a bar to a meritorious claim for salvage."[12] In the present case, there was a binding agreement "to pay at all events."[13]

We do not agree with the district court, however, that the present record permits the conclusion that an express or implied agreement was reached that Solana and Lally would be compensated for their work stabilizing the DDI immediately following Katrina on the same basis that they had been compensated just prior to Katrina. The parties have not briefed any legal theories that support the district court's conclusion that the plaintiffs should be compensated on the same basis as they were paid for their prior service on the

---

[11] See The Camanche, 75 U.S. 448 (1869).

[12] Id. at 477.

[13] Id.; see also Flagship Marine Servs., Inc. v. Belcher Towing Co., 966 F.2d 602, 605 (11th Cir. 1992) (finding a binding agreement for salvage services regardless of whether the services were successful and noting "we agree that there was no contract to pay a given sum for the services Sea Tow rendered; nonetheless, we cannot agree . . . that the services . . . were voluntary services" in light of the parties' prior business dealings); cf. Fort Myers Shell and Dredging Co. v. Barge NBC 512, 404 F.2d 137, 139 (5th Cir. 1968) (finding insufficient evidence that a towing company had agreed to a modification and continuation of an existing "relatively simple" towing agreement when such a modified agreement would have required "time-consuming and extensive unbeaching operation for the same fee," but declining to "reach the issue of whether they might have entered into a salvage contract rather than a continuation of their prior towage contract").

DDI. Summary judgment should not have been granted regarding the amount of compensation.


III

Although Solana and Lally have briefed and argued general-maritime-law principles governing salvors, their primary contention on appeal is that their claims for salvage are instead governed by the International Convention on Salvage of 1989.[14] GSF counters by arguing that the Convention is not self-executing, has not been implemented in its entirety by enabling legislation, and that the United States has not implemented it to apply to offshore drilling platforms or units. GSF further contends that even were the Convention otherwise applicable, Article 3 of the Convention expressly excludes vessels such as the DDI. Article 3 provides: "This Convention shall not apply to fixed or floating platforms or to mobile offshore drilling units when such platforms or units are on location engaged in the exploration, exploitation or production of sea-bed mineral resources." Solana and Lally respond that the DDI had never engaged in exploration when it was damaged by Katrina and had drifted approximately a quarter of a mile from its original location as a result of the hurricane.

It is unnecessary to reach the foregoing questions to resolve whether GSF was entitled to summary judgment. We will assume, but we stress that we are not deciding, that the Convention is enforceable in this nation's courts and that the DDI is not excluded by Article 3. Articles 6(1) and 17 of the Convention require us to conclude that each of the plaintiffs had an agreement with GSF that forecloses a pure salvage claim.

---

[14] International Convention on Salvage, Apr. 28, 1989, S. Treaty Doc. No. 102-12, 1953 U.N.T.S. 193.

Article 6(1) provides that "[t]his Convention shall apply to any salvage operations save to the extent that a contract otherwise provides expressly or by implication." As discussed previously, Solana and Lally do not dispute that they reached an agreement with GSF to render aid to the DDI after it had been damaged by Katrina and that they expected to be compensated for their efforts even if unsuccessful. Article 6(1) forecloses the application of the Convention under the circumstances of this case even were it otherwise applicable.

Nor are Solana and Lally entitled to rely upon Article 17 of the Convention, which is entitled "Services rendered under existing contracts," and provides: "No payment is due under the provisions of this Convention unless the services rendered exceed what can be reasonably considered as due performance of a contract entered into before the danger arose." The summary judgment record is conclusive that Solana and Lally agreed to render aid to the DDI after "the danger arose." Their respective affidavits are replete with admissions that when they agreed to return to the DDI following Katrina, they knew the drilling unit had been severely damaged, and they knew of the risk involved.[15] Nor did

---

[15] Solana's affidavit states:

I was requested to have the team board dead DDI, restart her generators, conduct a damage assessment, keep her from sinking, and attempt to stabilize her. I agreed to lead the team.

\* \* \*

[My pre-Katrina duties did] not include boarding a sinking, unstable drill unit to restore power, stanch flooding, and correcting her severe list, all in circumstances of grave danger. What the volunteer team and I were asked to do far exceeded my and their normal duties.

\* \* \*

This small team was to attempt to restore power aboard the dead rig, determine the sources of and control the water ingress into the sinking vessel, and return the vessel to a stable condition. Each of us was at risk as the unstable, sinking vessel might capsize and sink with us aboard.

Lally's affidavit states:

[Before returning to the DDI] I learned that GSF had been informed by one of its customers, BP, that following Hurricane Katrina DDI was damaged and

11

their services to the DDI in the wake of Katrina reasonably exceed due performance of the undertaking to which they agreed. The Convention affords no basis for denying summary judgment in this case.

\*        \*        \*

For the foregoing reasons, the summary judgment is REVERSED and we REMAND for further proceedings consistent with this opinion.

---

listing as much as 12-15 degrees. This is a much larger list than I have ever experienced aboard a semi-submersible drilling vessel, and we all knew it indicated DDI must have sustained serious hull damage in the storm.

\* \* \*

Our small crew was to attempt to restore power aboard the dead rig, determine the sources of and control the water ingress into the sinking vessel, and return the vessel to a stable condition. Each of us was at risk as the unpredictable, sinking rig might capsize and sink with us aboard.

12